Carl I. GLASSMAN et al.,
Plaintiffs,

v.

WELDIN FARMS, INC., a Delaware Corporation, et al., Defendants.

Court of Chancery of Delaware,
New Castle.

Submitted Dec. 15, 1975.

Decided April 14, 1976.

Louis J. Finger, Richards, Layton & Finger, Wilmington, for plaintiffs.

Howard L. Williams, and Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, for defendant Weldin Farms, Inc.

Regina M. Small, Asst. Atty. Gen., for the defendant Dept. of Highways & Transportation.

Joseph M. Bernstein, Asst. County Atty., for the defendant Government of New Castle County.

BROWN, Vice Chancellor.

This is an action brought by residential property owners to enjoin the corporate defendant, Weldin Farms, Inc., from draining surface water in increased amounts into a small creek known as Turkey Run which passes through and along the property owned by the plaintiffs Glassman. The government of New Castle County and the State Department of Highways have been joined as defendants to the extent they may be necessary to the granting of complete injunctive relief by virtue of permits or agreements granted by them to Weldin Farms in connection with the drainage system of the latter here in issue. This is a decision after trial.

The issue for decision brings into focus what the parties argue to be a state of ambiguity existing in the decisional law of this State with regard to surface water drainage rights. Before wrestling with the precedents, however, I shall set forth the pertinent facts as I find them which must govern the outcome of the present controversy.

Plaintiffs Glassman live in a picturesque residential area known as Forrest Hills Park in the suburbs of Wilmington. They purchased their property in 1958 and moved into their home in 1959. Their property fronts on a street known as Simon Road. The watercourse in question, Turkey Run, flows under Simon Road and bisects a portion of plaintiffs' property as it flows toward the rear of their lot. As it reaches the rear of the lot, it turns sharply to the left so as to adjoin the rear boundary of the property. After some short distance it turns sharply to the right so as to flow along the side of property formerly owned by plaintiffs Muscelli and passes under Bedford Boulevard, the next street over. There is a small bridge over Turkey Run at both Simon Road and Bedford Boulevard with a double culvert under each so as to let the waters pass through. In fairness, Turkey Run is not large and, aside from the setting in which it now finds itself, it might be likened to a woodland ditch in a more rural area.

When the Glassmans purchased their property, there was very little flow of water in Turkey Run. In fact there were long periods of time when it remained completely dry. Over the years, however, as more and more development occurred upstream, the level of water began to rise and on occasion the creek flow would become turbulent. In 1967, for the first time, the creek overflowed its banks during a heavy storm. Since that time there have been several other occasions where the creek has overflowed, causing damage to one degree or another to the Glassman property. A garden planted on the far side of the creek has been washed away more than once. Tan bark used for walkways and plant coverings have been washed from the Glassman backyard with some overall regularity. During one heavy rainy period the kennel housing the Glassman hunting dogs was washed from its moorings and overturned, with near fatal consequences to the canine inhabitants. The basement workshop and wine cellar of the Glassman home was seriously flooded on one occasion, and on others water entered the house through the basement windows and a back door. During this period, surface water from a higher area to the west of the Glassman property flowed down Simon Road itself and emptied into Turkey Run.

Against this backdrop of intermittent inconvenience, the Glassmans returned from a vacation in September 1974, to discover that as a part of its development of higher lands up Simon Road, Weldin Farms had installed a drainage system which would carry surface water from about two-thirds of its land, or some 17 acres, down the southerly side of Simon Road so as to empty, through a 42 inch pipe, into Turkey Run at the Glassman property just inside the Simon Road bridge. Thus, drainage from a large portion of the proposed Weldin Farms residential development will now be channeled by means of storm sewers down to Turkey Run and through and around the Glassman property. After unsuccessful protest to Weldin Farms, this suit followed.

At trial the expert testimony showed that with Weldin Farms fully developed (and thus with a portion of the previously open ground being covered by streets, roofs, etc., so as to reduce the ability of rain water to be absorbed into the ground) about 4 per cent of the flow of the water reaching Turkey Run from Weldin Farms would represent an increase over the natural flow that occurred prior to the commencement of development. This percentage increase was premised upon a 50-year storm (i. e., one with an intensity occurring on the average of once every 50 years), and also assumed the full development of the Turkey Run drainage basin upstream from Simon Road plus the assumption that the peak flow from Weldin Farms would reach Turkey Run at Simon Road at the same time that the peak flow from upstream areas would reach the same point.

Based upon these assumptions, expert witnesses for the plaintiffs concluded that upon the full development of Weldin Farms, Turkey Run might be expected to rise about an additional one inch during the type of storm that would be likely to occur once every 50 years which, in turn, could cause a lateral, out-of-bank dispersion on the Glassman property of an additional 5 to 15 feet.[1] Expert witnesses for the defendants, using a 1971 flood level study prepared for the County as their source, offered the opinion that based upon a fully developed Turkey Run drainage basin, and assuming (as did one of plaintiffs' experts) that one-third of the resultant water level increase will be attributable to the Weldin Farms development, the water level of the creek at the rear of the Glassman property could be expected to rise .05 of a foot, or .2 of an inch, above the 1971 level in the event of a 50-year storm. In short, although differing in degree, the evidence indicates that the development of Weldin Farms and the resultant channeling of its surface water into Turkey Run at Simon Road by means of storm sewers as opposed to a natural runoff, will result in a small increase in the flow of the creek during a heavy storm which, when the creek is out of its banks anyway because of the storm, will cause its overflow to be somewhat wider in scope and to flood a greater portion of the Glassman property than would normally occur without the development of Weldin Farms and the artificial channeling and draining of its surface waters. By the same token the frequency of out-of-bank flooding would also be increased to a slight extent.

It is the position of the plaintiffs that the law of this State is such that an upper landowner may not artificially increase the flow of surface waters upon a lower landowner above its natural rate or volume, no matter how minimal the increase may be. They further take the position that an increase which will cause additional flooding constitutes an interference with the right of the lower landowner to the use and enjoyment of his property, and thus may be enjoined as a continuing nuisance even though in terms of dollars such periodic flooding may not constitute a great or substantial injury.

Defendant Weldin Farms disputes this, arguing that the test to be applied under Delaware law is that of reasonable use, and that in the absence of evidence of substantial injury to the lower owner, he has no standing to object to a minimal increase by an upper owner nor can he justify the issuance of an injunction on the theory that otherwise he will suffer irreparable harm. Weldin Farms also points to the fact that before finalizing the purchase of the land for some $500,000 obtained approval of its drainage plan into Turkey Run from both the County and the State Department of Highways, and to now require it to take additional steps to slow down the flow of drainage water through retention devices would impose a severe monetary hardship upon it out of all proportion to the benefit that would be received by the plaintiffs.

All defendants further rely on the fact that the County has adopted ordinances pertaining to the use and approval of drainage into natural watercourses and, by § 6–15.1 of the Code has provided that "(2) Inundation of yards, periodic basement flooding is not considered significant damage . . . ." Thus, it is argued, legislative descretion and judgment has been exercised so as to define the very conditions of which plaintiffs complain as being insufficient to deny Weldin Farms its intended use of Turkey Run.

1. It should here be noted that the Glassman property lies partially within the 50-year flood plain of Turkey Run. Under present zoning and subdivision regulations it is my understanding that residential construction would not be permitted within such flood plain. However, there was no such restriction in 1958–59 when the Glassmans purchased and moved onto the property.

## I.

In an effort to get a handle on the threshold issue presented by the foregoing facts and arguments, I hereby state the question, as I perceive it, as follows: Where in times of heavy rain, occurring on an intermittent basis over a period of years, a natural waterway, is known to overflow its banks and flood the land of an adjacent property owner, may an upper owner be permitted to artificially increase the natural drainage of surface water into the stream in such a manner as to increase the area of flooding on the property of the lower owner during such times of heavy rain, regardless of how insubstantial the increase may be and despite the fact that it causes no permanent injury or substantial economic loss to the lower owner?

It is on this narrow point that the parties take differing views of the existing Delaware case law. Since these precedents are only five in number, and since I am not noted for brevity of opinion anyway, I think it beneficial to analyze the development of these precedents in some detail.

The first case is *Chorman v. Queen Anne's R. Co.*, Del.Super., 3 Pennewill 407, 54 A. 687 (1901). There the defendant railroad had cut ditches on its right-of-way which directed surface water from its property *into the field* of an adjoining farmer (and not into a natural watercourse on the farmer's land). In charging the jury the court noted that the case dealt only with the principles of law which governed the throwing of surface water from the land of one owner "into and upon" the land of a neighbor. It was thereafter stated as follows at 54 A. 690:

> "The conclusion seems to be that where the surface waters are collected and cast in a body upon the proprietor below, *unless into a natural water course*, the lower proprietor *sustains a legal injury*, and may have his action therefor." (Emphasis added.)

Thus, it may be said that this case stands for the proposition that any increase caused by a diversion of surface water into and upon the lands of another, where it would not have otherwise gone, constitutes an injury to the recipient owner, no matter how small the increase. This favors plaintiffs' interpretation.

The second case is that of *Staats v. Hubbard*, Del.Ch., 31 Del.Ch. 41, 63 A.2d 856 (1949). There the complaint alleged that the defendants had raised the level of their land above that of the plaintiffs thereby diverting surface water into and upon the lands of the plaintiffs. Defendants moved to dismiss on the theory that "a property owner may permit the flow of surface water and get rid of it in any way he can, provided only that he does not cast it by drains and ditches upon the lands of his neighbor." In ruling on the motion, the Chancellor assumed that prior to the time the level of the land was raised, defendants' surface water either did not flow onto the plaintiff's land or else did so without injurious consequences. In denying the motion and holding that the complaint did state a claim under the principles of the *Chorman* case, the Chancellor noted that "the injury must be 'material' before the court will grant relief." He went on to state as follows at 63 A.2d 857:

> "It seems to me that in situations such as the one presented by this complaint the test of reasonable user should be applied."

Although the Chancellor neglected to define what the "test of reasonable user" was as he viewed it, it may be assumed that this decision favors the defendants' argument here that an increase on the lower owner is permissible as long as it causes no substantial damage or injury. As such it differs from the instruction on the law in *Chorman*.

The third case is *Ciconte v. Shockley*, Del.Ch., 31 Del.Ch. 376, 75 A.2d 242

(1950). There the defendant constructed a building on his lot in such a fashion that rainwater fell from its roof onto a concrete alleyway and seeped under the doorsills and into the commercial building of the plaintiff. The Chancellor found that this circumstance justified an injunction in favor of the plaintiff and, in the process, set forth the following principles.

First, an owner of land cannot, by artificial means, lawfully collect and precipitate surface water in increased and unnatural quantities upon the land of his neighbor to his *substantial injury* or damage (citing *Chorman*). Second, while a piece of land may receive without injury a considerable amount of surface water which gently flows thereon from upper premises, when it is collected and discharged in mass at a given point it may become injurious. Third, while normally an injury must be substantial and not merely trivial and temporary in order to warrant injunctive relief, if rights are being continually invaded such relief may be granted even in the absence of destruction to property.

Consequently, this decision would seem to lend support to the defendants' argument that an increase is permissible in the absence of substantial injury to the lower owner as well as to plaintiffs' argument that where even a slight increase adversely affects their use of their property they are entitled to an injunction even though they are suffering no substantial economic loss.

The fourth case is *E. J. Hollingsworth Company v. Jardel Co.*, Del.Ch., 40 Del.Ch. 196, 178 A.2d 307 (1962). There the plaintiff's lands had served for years as the natural drainage area for the surface waters of the surrounding land—including most of that of the defendants. This surface water meandered across plaintiff's land in an easterly direction to a culvert under railroad tracks which bordered the property. At some point in time plaintiff ran a pipe from a road to the front of its property some 80 feet. This pipe was then connected to a ditch dug by plaintiff to

thereafter carry the surface water in a straight line to the eastern boundary of its property, and thereafter parallel to the railroad tracks a few hundred feet to the culvert under the tracks.

The evidence showed that the defendant proposed to connect a storm sewer draining its property to the pipe and ditch on plaintiff's property. It also showed that the blacktopping of the defendant's land would cause a five-fold increase in the amount of surface water to be carried by the ditch, and that in order to support this increase a larger pipe would have to be installed on plaintiff's land and the ditch would have to be widened from 5 to 15 feet in order to prevent the flooding of the plaintiff's land.

The Chancellor initially noted from the above circumstances that the case did not concern a stream (or, presumably, a natural watercourse), that the defendant did have a "right" to have its surface water flow across plaintiff's land since that was the natural drainage area prior to the ditch, and that consequently the defendant had a drainage easement across plaintiff's land which was not diminished by the fact that plaintiff had caused an open ditch and pipe to replace the natural line of flow of the surface water.

Despite this, however, the Chancellor held that the defendant had no right to demand an enlargement of this drainage easement over plaintiff's property so as to accommodate an artificial increase in flow caused by the improvement of defendant's land—even if the defendant was willing to bear the expense. He observed that without an enlargement, the increased flow of surface water would create an excessive burden on the easement, and thus a continuing nuisance. Nor would the fact that other upper landowners were helping to impose a continuing burden on the easement justify defendant's proposed action. By way of a conclusion of law it was stated at 178 A.2d 308 that

". . . one may not in effect *substantially* enlarge or change a natural drainage easement by artificially collecting and casting the surface water on the lower owner to his *substantial* damage." (Emphasis added.)

But for the interpretation later given to the ultimate decision of the Chancellor by our Supreme Court, this last quoted language would seem to support the defendant's "reasonable user" argument. As it is, plaintiffs say Hollingsworth supports them.

The final case is *Pierce Family, Inc. v. Magness Construction Company*, Del.Supr., 235 A.2d 268 (1967) and it apparently represents the only expression on the subject by our highest Court. In that case plaintiffs were the upper owners. The natural drainage of their surface waters was by a stream flowing across defendant's land into a larger creek. Defendant proceeded to develop its land by the erection of apartment buildings, and in the process the stream was blocked and a 24 inch pipe installed to transport its waters. This pipe was more than adequate to meet the existing drainage requirements of the plaintiffs' land. Plaintiffs contended, however, that as the land above them would be developed in the future, the flow of water would increase, the pipe would be inadequate to handle it and the water would eventually back up and flood their land. The court below denied injunctive relief and the Supreme Court affirmed.

The court noted that the point at issue was "whether or not an upper landowner can compel a lower landowner to provide drainage facilities to carry off an amount of water increased artificially above the natural drainage level." In answering in the negative, the court proceeded to set forth certain general principles, one of which was that

"[i]t also follows that an upper owner may not artificially increase the flow of water upon lower lands *above its natural volume.*" (Emphasis added.)

It was then observed that this was one of the rules constituting the law of this State as established by *Hollingsworth, Ciconte, Staats*, and *Chorman, supra*. Those cases were thereafter specifically approved.

Finally, and of considerable significance to the present issue, the court stated as follows at 235 A.2d 270:

"Plaintiffs argue that the holding of the *Hollingsworth* case was that a lower owner is required to accept a reasonably increased burden in the easement, but we think that this interpretation of the holding is incorrect. *The case stands flatly for the proposition that the burden of an easement on lower land may not be increased by artificially increasing the flow of water.* (Emphasis added.)

"It is true that the Chancellor said that one 'may not in effect substantially enlarge or change a natural drainage easement', from which, we assume, the plaintiffs conclude that a reasonable but not substantial increase may be accomplished. We think, however, the assumption reads more into the Chancellor's language than was intended."

Thus, plaintiffs here urge that *Pierce* clearly supports their position and mandates that an injunction issue since the expert testimony offered by both sides unequivocally demonstrates that Weldin Farm's drainage system will increase the flow of water in Turkey Run in times of heavy rain so as to increase the overflow onto the Glassman property. Defendants, however, argue that *Staats, Ciconte* and *Hollingsworth, supra*, (as well as two recent unreported opinions of this Court[2]), all espouse the reasonable user test because of the language employed in the opinions requiring the injury to the lower owner to the "material" (*Staats*), "substantial" (*Ci-*

---

2. *Allenhurst Company, Inc. v. James Breiner*, Del.Ch., (C.A. 3300–1970); *Burbage v. Donovan*, Del.Ch., (C.A. 502–Sussex–1975).

*conte*) and "substantial" or "excessive" (*Hollingsworth*). They respectfully suggest that the *Pierce* decision is ambiguous in that it seems to reject the reasonable user test while at the same time noting that the above three decisions, along with *Chorman*, "have been the law of this State. . . . We approve them." 235 A.2d 270. They point out that one recognized authority refers to the *Pierce* holding as being "unclear" and suggests that the Court "was confused." 5 *Clark*, Water and Water Rights (1st Ed. 1967) 543–544. Needless to say, if this latter is true, it is not for me to make the formal announcement.

On the other hand, I think it is proper to observe what our foregoing precedents have neglected to mention as such, namely, that in the area of disposing of surface waters two basic and diametrically opposed views were initially developed by court decisions in this country. One was known as the "common enemy doctrine" which held, in substance, that an owner of land had an unqualified right to dispose of surface waters on his land as he saw fit, regardless of the consequences to lower landowners who, in turn, had a duty to protect themselves as best they could. The other view was known as the "civil law rule," which was to the effect that one may not interfere with the *natural flow* of surface waters so as to cause an invasion of another's interest in the use and enjoyment of his land. Included within this concept is the principle that an upper owner can do nothing to change the natural system of drainage so as to increase the burden on a lower owner. 78 *Am.Jur.2d*, Waters §§ 120, 121; 93 *C.J.S.* Waters § 114; *Armstrong v. Francis Corporation*, 20 N.J. 320, 120 A.2d 4 (1956). With the passage of time, however, the courts of a number of states declined to accept either of these doctrines in their rigid form but rather developed the rule of "reasonable user" which, simply stated, takes into consideration the circumstances of each particular case when weighed against such factors as the amount of harm caused, the foreseeability of the harm which results, and the purpose or motive with which the landowner acted so as to determine whether the utility of the owner's use of his land outweighs the gravity of the harm which results from the alteration of the flow of the surface waters. 78 *Am.Jur.2d*, Waters § 116; 5 *Clark*, Water and Water Rights § 450.6; 1A *Thompson*, On Real Property (1964 Ed.) § 259. In fact, some authorities take the position that neither the common enemy rule nor the civil rule presently exists in pure form even in the jurisdictions apparently holding to them, but rather they have been modified by subsequent decisions which tend to apply a reasonable use test in result if not by name. 5 *Clark*, Water and Water Rights §§ 451.3 and 452.3; *Armstrong v. Francis Corporation, supra.*

Viewing these three approaches to the problem in light of our aforesaid precedents, I feel the following conclusions are warranted as of this time. First, the common enemy doctrine has never been adopted in Delaware. Second, while rendering decisions consistent with the civil, or natural flow, rule, *this* Court has recognized the existence of the reasonable user rule and has indicated that it could be made applicable in a given situation. Third, our Supreme Court has held in *Pierce* that the civil, or natural flow rule applies in this State and has rejected, at least to this point, the reasonable user rationale. Compare the construction placed upon the *Pierce* and *Hollingsworth* cases in 78 *Am.Jur.2d*, Waters § 128; 93 *C.J.S.* Waters § 116.

■ Having come to this conclusion, it necessarily follows that the plaintiffs have made out a case for injunctive relief against Weldin Farms and the County unless there is some other basis for denying it. The evidence shows that in times of exceptionally heavy rain the flow in Turkey Run will be artificially increased by Weldin Farms, as and when fully developed, over the flow which would have ex-

isted without the full development of the land. And despite the fact that this increase will be minimal in terms of raising the level of water flow, where the stream would be out-of-bank anyway the increase in flow will cause a greater lateral dispersion which, in turn, creates a greater likelihood of flooding to the Glassman residence and certainly increases the area of the burden of the lower easement. And in so stating, I admit to having received the impression from the evidence that the so-called 50-year storm on which the calculations were premised is in reality likely to occur far more often than once every 50 years. (Compare the observation of Chancellor Seitz in *Hollingsworth* that a 10-year storm can be anticipated to occur about four times a year. 178 A.2d 307.) The argument of Weldin Farms that plaintiffs have failed to show sufficient damage to their property to justify the issuance of an injunction is readily answered by the well recognized principle that injunctive relief will lie to prevent a continuing invasion of property rights once the inevitability of the invasion is established. This is particularly true with regard to the flooding of land. *Ciconte v. Shockley, supra; Sisters of St. Joseph Corp. v. Atlas Sand, Gravel & S. Co.*, 120 Conn. 168, 180 A. 303 (1935).

## II.

Next, consideration must be accorded the mutual defense of all three defendants based upon the County drainage code, which appears as Chapter 6 of the New Castle County Code. This defense may be summarized as follows.

By 9 Del.C. § 1101 (effective January 3, 1967) the General Assembly conferred upon the government of New Castle County "all powers which it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute . . . ." *Ingersoll v. Rollins Broadcasting of Delaware, Inc.*, Del.Supr., 269 A.2d 217, 219 (1970). The object of 9

Del.C. Ch. 11 was to grant "home rule" to the County, 269 A.2d 219, and, as such, it was presumably enacted with an awareness of 9 Del.C. Ch. 30 (approved May 4, 1965). This latter chapter authorized the County to regulate subdivision and land development within its boundaries. By 9 Del.C. § 3002, the County, so as "to afford adequate provisions for . . . drainage," among other things, was empowered to regulate the subdivision of all land in the County outside the corporate limits of any city or town. Pursuant to this grant of power, County subdivision regulations were enacted by ordinance in 1968 and the aforementioned drainage code was enacted by ordinance in 1969. A 1974 amendment to the drainage code added the language at § 6–15.1 indicating that "[i]nundation of yards, periodic basement flooding is not considered significant damage . . . ."

The subdivision regulations require a developer to submit detailed drainage plans for a proposed subdivision to the County for its approval. Weldin Farms did so here and the plan now being challenged by the plaintiffs was approved by the County. The County engineer who reviewed the plan testified that she was aware, prior to the proposed development of Weldin Farms, that Turkey Run periodically overflowed its banks resulting in some yard and basement flooding, but that in her judgment the slight increase in flow that would be attributable to the Weldin Farms plan would not significantly aggravate the already existing situation to such an extent as to require retention or detention by the developer. She further testified that in her judgment detention or retention for such a minimal increase in surface water flow into Turkey Run would be economically impractical for the County from a maintenance standpoint.

Based upon these factors the defendants argue that the approval of the Weldin Farms plan by the County was a judgment exercised in good faith within a proper area of governmental discretion. As such,

they argue that the approval by the County falls within the protection of the rule established in *High v. State Highway Department,* Del.Supr., 307 A.2d 799 (1973), which in effect, held that a good faith exercise of judgment and discretion in the performance of administrative functions by a governmental agency is a legally protected area of decision-making in which the discretionary decision of the agency does not expose it, or those who act in reliance on its decision, to tort liability even if injury to another may result therefrom.

The *High* case involved a wrongful death action brought against the State Highway Department, the private contractor doing construction work for it, and the owner and operator of the trucks involved in the collision with the plaintiff's decedent. The Highway Department and the contractor appealed from that portion of the damage verdict against them which had been premised on their alleged negligence in rerouting traffic in an area of road under construction. As part of the contract requirements the contractor had been required to submit for approval a plan for the proposed detour. It had done so and the plan had been approved by the Highway Department. The evidence indicated that the detour had been routed and marked in accordance with the plan. Also, despite expert testimony indicating the manner in which the detour could have been more safely accomplished, the evidence indicated that the traffic flow scheme as approved was prepared in compliance with a Manual of Uniform Traffic Control Devices used by the highway departments of almost all the states and was thus within nationally accepted standards. Based upon these facts the Supreme Court reversed in favor of the Highway Department after noting that the traffic-routing plan approved by it was the product of a good faith exercise of judgment or discretion by its trained personnel. Likewise, since the Highway Department could not be held liable for having approved the plan, neither could the contractor who administered it without deviation in performing its work.

Also relied upon by the County is the early case of *Hession v. Mayor, Etc., of Wilmington,* Del.Super., 1 Hardesty 101, 27 A. 830 (1893). There a suit for damages was brought because of flooding to the plaintiff's property when storm sewers backed up in an exceptionally heavy rain. The court charged the jury that since the defendant city had the exclusive power to determine the plans of streets, culverts and sewers, its decision in adopting such plans was "a quasi-judicial or discretionary power or duty" and consequently for "any fault or defect in such plans, resulting in damage to the individual citizen" it could not be held liable. On the other hand, it could be held liable if the damage resulted from fault or defect in carrying such plans into execution. 27 A. 831.

Thus the County here argues that since it was given power by statute to regulate surface water drainage, and since it has adopted regulations pursuant to such authority under which it can approve a drainage plan even if the plan does recognize the probability of periodic increases in flooding on a downstream owner, the decision to approve the Weldin Farms plan was an exercise of its governmental judgment and discretion for which it cannot be held accountable by certain of its citizens who are likely to suffer some small adverse effects as a consequence. Likewise, under *High*, Weldin Farms says it is protected by the approval given to its proposed plan by the County, pointing out that it has acted in good faith by having prepared and submitted a plan as required by the drainage code and by having had it approved without question.

Plaintiffs respond to this contention by asserting that the County cannot have made a good faith exercise of its administrative discretion since it is in violation of

its own drainage code. They refer specifically to § 6–14(a) which reads as follows:

"(a) In order to minimize downstream flow increases, developers may be required to provide on-site storm water storage capacity in the form of delayed run-off designs. Such provision *shall be required* when downstream improvements are physically or economically impractical or when the increased run-off is disproportionate to that of the remainder of the area." (Emphasis added.)

They point out that even if the run-off on their downstream property is not deemed disproportionate, it was admitted by the County engineer that the County has not assumed responsibility for maintaining the downstream flow condition of Turkey Run at this time because, first, it lacks the necessary rights-of-way, and second, it lacks the funds. Thus, plaintiffs conclude, § 6–14(a) should have mandated detention or retention by Weldin Farms. Defendants' response to this is that § 6–14, when read in it entirety, indicates that the emphasized language of § 6–14(a) is not mandatory but rather that the overall decision as to requiring on-site storm water storage lies in the discretion of the County in all cases.

In dealing with this question concerning the effect to be given to governmental regulation of land subdivisions by the County, I find it unnecessary to make the answer turn on an interpretation of the intent of § 6–14. I reach this conclusion because unless it is first established that the County can alter the Delaware common law rights of a downstream landowner by an ordinance enacted pursuant to statutory power to regulate subdivisions of land, whether the ordinance purports to do so or not is without controlling significance. And I am of the opinion that under the existing status of the law it has not been established that the County has such power. I base this on the following analysis.

*Pierce Family, Inc. v. Magness Construction Company, supra,* was decided in 1967 and, under the interpretation that I have previously given it, that decision established our law to be such that an upper owner cannot, by artificial means, increase the burden of surface water drainage on a lower owner, even to a relatively insubstantial degree. The ordinance-established regulations on which the County relies were enacted in 1968 and 1969 respectively. Thus, to the extent that these ordinances purport to give the County discretion to approve a subdivision drainage plan even though it may increase the flow of surface water on a downstream owner, they conflict with our common law as previously announced by our Supreme Court. The County relies on 9 Del.C. § 1101 and 9 Del.C. § 3002 as giving it the authority to do this. However, the general grant of powers given to the County by the General Assembly by 9 Del.C. § 1101 contains the following express limitation:

"This grant of power does not include the power to enact private or civil law concerning civil relationships, except as incident to the exercise of an expressly granted power . . . .."

Since § 3002 authorizes the County to regulate drainage in subdivisions without saying more, it must be assumed that such regulation is to comport with the existing law of the State. Stated another way, the express grant is to regulate drainage in subdivisions. There is nothing to indicate that in so doing the County may alter civil relationships between landowners that would otherwise exist at law.

This being true, the *High* and *Hession* cases become immediately distinguishable, since in neither did the discretion and judgment exercised by the governmental agency contravene an established right of either plaintiff. In *Hession,* since a city resident presumably has no right to dictate when and how the city must construct a storm sewer along his property, there is no

preexisting right to demand that the city, when it does construct it, do so in such a manner to handle unusually large storms or be liable in damages as a consequence. In *High,* while presumably a motorist has right to expect that a rerouting of traffic by a contractor be required by the State to meet reasonably acceptable safety standards, he has no right to expect something more. Here, however, plaintiffs did have a right under *Pierce* to be free from any artificial increase in surface water drainage on their property attributable to an upper owner. Thus, neither *High* nor *Hession* are dispositive of the issue.

As a consequence of the foregoing, I find the defense premised on the governmental authority and discretion of the County to be unpersuasive.

## III.

■ I turn next to the argument of Weldin Farms that even if it be found as a matter of legal principle that the plaintiffs are entitled to an injunction, such relief should still be denied based upon a balancing of the benefits and hardships that would flow from such relief. Specifically, it is argued that when the issuance of an injunction will cause great injury to a defendant, and will confer little or no benefit on the complainant in comparison, it is proper to refuse the injunction. *Hollingsworth v. Szczesiak,* Del.Ch., 32 Del.Ch. 274, 84 A.2d 816 (1951); 43 *C.J.S.* Injunctions § 30. It is said that any benefit which would flow to the plaintiffs here would be small while on the other hand, if Weldin Farms is required to install a water detention or retention facility, it will require them to utilize a plotted building lot which now reflects an outlay of $19,000 in acquisition costs and improvements. Thus it will be deprived of the value of the lot in addition to the costs of constructing the impoundment, all to prevent the occasional flooding of plaintiffs' property from being a little greater in degree.

While the foregoing equitable principle is well established, and sometimes employed, the fact remains that as applied to the present situation it is merely another way of advancing the reasonable use argument. In short, it is an argument that if the injunction is granted the benefit to the plaintiffs will be far outweighed by the gravity of the monetary loss to be thrust upon Weldin Farms, and that consequently the injunction should be denied and Weldin Farms permitted to increase the surface water burden on the lower owner to a slight extent.

However, to those who have experienced the flow of water under their back door, or who have listened helplessly to the steady trickle of water into their finished basement and have thereafter endured the task of cleaning the silt-like residue, the benefit may seem in no way small.

Secondly, even if such a reasonable use or balancing of the benefits test is to be applied, I think that it must be done with an awareness that plaintiffs are first-on-the-scene homeowners defending the right to use and enjoy their property while Weldin Farms is a land developer engaged in an enterprise for profit. With this in mind, I think that the observation of then Justice Brennan of the New Jersey Supreme Court, in *Armstrong v. Francis Corporation, supra,* sums up this balancing argument in far better language than I can conceive. At 120 A.2d 10 he stated as follows:

"It is, of course, true that society has a great interest that land shall be developed for the greater good. It is therefore properly a consideration in these cases whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. [Citation omitted.] But while today's mass home building projects, of which the Francis development is typical, are assuredly in the social good, no reason suggests itself why, in justice, the eco-

nomic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit. Social progress and the common wellbeing are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason."

Consequently, even if it is proper here to balance the benefits and hardships that will stem from the issuance of an injunction, that balance tips in favor of the plaintiffs as I view it. Of course, this is another way of saying that even if the reasonable user test is the one to be applied, even a slight increase in downstream flow should not be permitted where the predictable consequence will be the occasional flooding or an increase in the degree of flooding to a dwelling and residential lot in an urban area as compared, for example, to an unused field in a rural area.

### IV.

 Finally, it is contended that the plaintiffs have been guilty of laches in having failed to take action prior to the time that Weldin Farms made its commitment to purchase the property and set upon the construction of its drainage system. On the evidence presented I find this defense to be without merit. I do feel, however, that the defendants have a point when they urge that the plaintiffs Muscelli are not entitled to injunctive relief. The evidence shows that since the inception of the suit the Muscelli plaintiffs have sold their property and no longer reside there. Their successors in title made no effort to be substituted or added to the suit as parties plaintiff. Consequently, I fail to see how the Muscellis are now entitled to the benefit of an injunction issued to protect, in part, property which they no longer own. The fact that they have taken back a second mortgage from the new owners is not of such significance as to entitle them to the personal benefit of an injunction which does not run by name in favor of their mortgagors as I see it.

### V.

Judgment will be entered in favor of the defendants as to the plaintiffs Muscelli. Judgement will be entered in favor of the plaintiffs Glassman enjoining the defendant Weldin Farms, Inc., and to the extent necessary the defendant New Castle County and the defendant State Department of Highways, from in any way draining the surface waters of the Weldin Farms development into Turkey Run in any manner which would cause an increase in the natural flow of Turkey Run over that which existed when the Weldin Farms area was in its natural and undeveloped state.[3]

Counsel for plaintiffs is directed to present a form of order, on notice.

---

3. For reasons not here important, plaintiffs Levinson were dismissed from the suit during trial.