**WELDIN FARMS, INC., a Delaware Corporation, Defendant Below, Appellant,**

v.

**Carl I. GLASSMAN and Wilma K. Glassman, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted Oct. 10, 1979.

Decided April 7, 1980.

---

Edward M. McNally and Howard L. Williams, of Morris, James, Hitchens & Williams, Wilmington, for defendant-appellant.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, for plaintiffs-appellees.

Catherine S. Mulholland, Wilmington, for amicus curiae New Castle County.

Before HERRMANN, C. J., and McNEILLY and QUILLEN, JJ.

QUILLEN, Justice:

The appellant, Weldin Farms, Inc., a developer of residential property, has appealed a judgment of the Court of Chancery enjoining it from draining the surface waters from its development, situated upstream from the appellees' property, into a stream known as Turkey Run which runs alongside and through their property, in any way which would increase the volume of its natural flow above what it had been before the development of the upstream property. With the laying of pavement, the amount of surface water which runs into Turkey Run off the ground, rather than being absorbed into it, has greatly increased.

The problem situation giving rise to this litigation first arose when Turkey Run, which had for the most part been dry when the appellees, the Glassmans, moved into the downstream property in 1959, began, as a result of gradual development of properties upstream, to increase in volume and to overflow its banks during storms. This first happened in 1967, and then on subsequent occasions, with resultant damage to the Glassman residence. The Glassmans have had their garden, and the tan bark used for walkways and plant coverings washed away, their basement flooded and waters entering the house through basement windows and a back door, and their dog kennels unhinged from their moorings and overturned.

When Weldin Farms installed its drainage system in 1974, the Glassmans protested its plan to drain surface water from 17 acres, or two-thirds of its land by directing it down the southerly side of Simon Road, upon which their property abuts, to empty into Turkey Run through a 42-inch pipe placed at their property. In the ensuing litigation both sides presented expert testimony as to the effects of Weldin Farms' drainage system on Turkey Run and the Glassman property. The premises upon which the testimony was based were that there would be a storm of the intensity

which only occurs every fifty years, that the Turkey Run drainage basin would be fully developed, and that the "peak flow" from Weldin Farms would reach the Glassmans at the same time that the peak flow from other upstream areas would reach the same point. The Vice Chancellor concluded that, although the degree of flooding was uncertain,[1] there would definitely be a slight increase in the flow of Turkey Run during a storm due to the channeling from Weldin Farms. The consequent lateral dispersion of waters overflowing the banks of Turkey Run would cause greater flooding of the Glassman property than would otherwise occur.

The Vice Chancellor ruled that the law of this State concerning the respective rights of upstream and downstream landowners with regard to the drainage of surface waters follows the "civil law" or "natural flow" doctrine to the effect that the upper owner may not, by any alteration of the natural drainage pattern, increase the level, volume or velocity of the flow in a natural watercourse to the increased burden of the lower owner. *Vantex Land and Development Co. v. Schnepf*, Ariz.Supr., 82 Ariz. 54, 308 P.2d 254 (1957); *Templeton v. Huss*, Ill.Supr., 57 Ill.2d 134, 311 N.E.2d 141 (1974); Annot., 93 A.L.R.3d 1193, 1207–1211 (1979); 3 Tiffany, *Real Property* § 734 (3rd ed. 1939); 78 Am.Jur.2d *Waters* § 121 (1975); 93 C.J.S. *Waters* § 114 (1956). Appellants urge that that is not the proper interpretation of Delaware law, or alternatively, that this Court should modify that law by adopting the doctrine of reasonable user which has recently been gaining authority in numerous jurisdictions. Annot., 93 A.L.R.3d 1193, 1216.

It should be noted that three theories of the rights of landowners to drain their surface waters have evolved in this country. There is no clear English common law on the subject. Kinyon & McClure, *Interferences with Surface Waters*, 24 Minn.L.Rev. 891, 899–902 (1940). The right of an upper

landowner to drain without interference the natural flow of water from his land to the land below has not been questioned. The further question of what, if anything, an upper landowner could do artificially to increase the flow of his waters downstream was answered by one of three options: (1) the "common-enemy" rule, which held that an upper landowner had the right to dispose as he pleased with surface water on his property and that the burden was on the lower landowner to protect himself from adverse consequences of any excess flow [Annot., 93 A.L.R.3d 1193, 1199–1203; 78 Am.Jur.2d, *Waters* § 120]; (2) the "natural flow" rule mentioned above; or (3) the "reasonable user" rule, urged by the appellants, which, eschewing the rigid formulations of the two earlier rules, seeks to inquire into the facts of each case to determine the reasonableness of the effects of the action on the interests of all parties affected [Annot., 93 A.L.R.3d 1216–1221]. The third approach has been said to represent a shift in the manner of viewing such problems from a property analysis to a tort analysis. Kinyon & McClure, *supra*, 24 Minn.L.Rev. at 936–939. Matters considered include the amount of harm caused, the foreseeability of the harm which results, the utility of the owner's use of his land as weighed against the gravity of the harm which results from altering the flow of surface waters [see *Micucci v. White Mountain Trust Co.*, N.H.Supr., 114 N.H. 436, 321 A.2d 573, 575 (1974); *Armstrong v. Francis Corp.*, N.J.Supr., 20 N.J. 320, 120 A.2d 4, 10 (1956); *Tucker v. Badoian*, Mass. Supr., 384 N.E.2d 1195, 1201–1202 (1978) (concurring opinion of Justice Kaplan); 5 Clark, *Waters and Water Rights* §§ 450.6, 453.3 (1972)] and, following the Restatement of Torts (Second) §§ 822–833 (1979), whether the upper owner's conduct is intentional and unreasonable, or reckless or negligent. Thus, the reasonable user rule, unlike the earlier two rules, allows the Court to balance the interests of the parties involved and also to consider as a relevant

---

1. For a full presentation of the facts and the substance of the testimony, see *Glassman v. Weldin Farms, Inc.*, Del.Ch., 359 A.2d 669, 670– 672 (1976). We accept the factual findings of the Vice Chancellor.

factor the social value of land development, a factor the strict natural flow doctrine ignores. Professors Kinyon and McClure point out in their article that even in jurisdictions that purport to follow the earlier rules the courts have found themselves constrained to let in competing considerations when faced with an owner's desire to make normal use of and improvements on his land or contrarily to unduly aggravate the hardship to his neighbor. Some of the exceptions and qualifications to the older rules in practical effect amount to a limited adoption of the reasonable use standard.[2]

It is necessary to examine precisely what the Court of Chancery determined. The Vice Chancellor, in a very thorough and scholarly opinion, concluded that this Court in *Pierce Family, Inc. v. Magness Construction Company*, Del.Supr., 235 A.2d 268 (1967) held "that the civil, or natural flow rule applies in this State and has rejected, at least to this point, the reasonable user rationale." *Glassman v. Weldin Farms, Inc.*, Del.Ch., 359 A.2d 669, 676 (1976). He went on to say that "even if . . . a reasonable use . . . test is to be applied" and "even if it is proper here to balance the benefits and hardships that will stem from the issuance of an injunction, the balance tips in favor of the plaintiffs . . . ." *Id.*, 359 A.2d at 680–681. The separate written judgment, however, enjoined the defendants "from, in any way, draining the surface waters of the Weldin Farms development into Turkey Run at or above the intersection of Simon Road and Turkey Run in any manner which would cause an increase in the natural flow of Turkey Run over that which existed when the Weldin Farm development was in its natural and undeveloped state." Thus, judgment was clearly entered in accordance with the natural flow rule.

We turn now to our specific case precedent. It has been generally accepted that there are only five relevant cases. *Glass-*

man v. Weldin Farms, Inc., supra*, 359 A.2d at 673; *Pierce Family, Inc. v. Magness Construction Company, supra*, 235 A.2d at 270; 5 Clark, *supra*, § 456.2, pp. 542–544.

The first case, *Chorman v. Queen Anne's R. Co.*, Del.Super., 54 A. 687 (1901), concerned a situation where there was no natural watercourse on either plaintiff's or defendant's property, but defendant had constructed a ditch to drain the surface waters from his land onto plaintiff's wheat field, destroying plaintiff's crop. Stating that .it was dealing "only with the principles of law which govern the throwing of surface water from the land of one owner into and upon the land of a neighboring owner" (54 A. at 690), the Court concluded that the lower landowning plaintiff could recover if the jury found that the upper owner, by such ditching, had thrown surface waters on the lower owner's land, thereby destroying plaintiff's crop. Thus, the case is a very narrow one where the plaintiff would probably be permitted to recover even under the modified application of the common enemy rule permitting recovery in collection and discharge cases. 5 Clark, *supra*, § 451.2(A), pp. 491–492.

The Court of Chancery in *Staats v. Hubbard*, Del.Ch., 63 A.2d 856 (1949), in denying a motion to dismiss, drew upon the *Chorman* principle in a situation where the plaintiffs' next-door neighbors had raised the level of their land above the plaintiffs' with the result that their surface water was draining onto plaintiffs' property causing flooding damage. The Court insisted, however, on adopting a balancing approach in reaching its conclusion that the complaint stated a claim for equitable relief. "The governing principle of law in this field must reflect some practical adjustment of conflicting interests." 63 A.2d at 857. The Court did not want to reach a result that would impede the reasonable improvement of land, thus it required that the "injury

---

**2.** One type of "reasonable use" rule in force in a great majority of jurisdictions is that holding that an increase in the flow of a natural watercourse is permissible as long as the watercourse's capacity is not exceeded. 93 C.J.S. *Waters* § 117, 5 Clark, *supra*, 452.2(A); 1A *Thompson on Real Property* § 267 (1964). Clark suggests this modification "is probably the law in all jurisdictions" including "natural flow" jurisdictions.

must be 'material' " in order to justify relief and "the nature of the relief, if any," was reserved for determination after a factual hearing. 63 A.2d at 858. These criteria were elements of the "test of reasonable user" that the Court felt should be applied to the situation before it. 63 A.2d at 857. Thus, the case is a clear application of the reasonable use approach in a surface water flow situation.

The third case, *Ciconte v. Shockley*, Del. Ch., 75 A.2d 242 (1950), presented a slightly varied factual picture. The defendant, by constructing a building in such a way that rainwater collected on its roof and precipitated in large, concentrated quantities onto plaintiff's property where it would seep inside his buildings, had created an artificial condition of water drainage that was injuring the plaintiff. The Court was concerned with the continual, recurring nature of this invasion, and decided the case on the basis of nuisance principles, citing the *Chorman* decision to establish the wrongfulness of the defendant's action. Again, "substantial" injury was deemed a requisite to recovery, although the Chancellor noted that an exception existed when rights were being continually invaded, even where property was not being destroyed. As in *Chorman*, the case can be examined as a collection and discharge case and one that presents no unusual difficulty under any legal standard.

The fourth case, *E.J. Hollingsworth Company v. Jardel Co.*, Del.Ch., 178 A.2d 307 (1962), concerned a plan by the defendant to pave a large area of its property so that there would be a substantially increased run-off of water through a pipe, which had been installed years before, running across plaintiff's property, the natural drainage area for defendant's surface water. The pipe would then become inadequate to handle the flow without flooding plaintiff's land. Recognizing that the defendant had a drainage easement across the plaintiff's property, the Court ruled that defendant could not effectuate an enlargement in its easement. The Court rejected the defendant's suggestion that it widen the ditch holding the drainage pipe from five to fifteen feet so that it could accommodate the increased flow. The Court found that "an open ditch of such proportions will adversely affect the potential value of such land and will substantially enlarge the existing easement." 178 A.2d at 309. In refusing defendant's request that it reconcile the parties' interests in terms of economic burdens and benefits, the Chancellor apparently based his decision on the legal principle that, where a specifically defined easement had been created, each party's protectible interest lay in the established dimensions and uses of that easement, and it was not possible for the Court to alter their property rights on the basis of economic considerations. The Chancellor noted that "in the case of a clear and substantial invasion of plaintiff's property rights with no mitigating equities, there is no room for a court to weigh the relative benefits." 178 A.2d at 310.

But the Court did not hold that the defendant could not take the action which would increase the flow. Rather the Chancellor only found an "excessive burden on the easement in question when defendant directs all of its surface water into the pipe leading to plaintiff's property." *Id.* But the flow could be increased if the defendant could find a way to handle the excess flow in a satisfactory manner without enlarging the easement. Even in using property right concepts, the emphasis was on an "excessive burden on the easement" suggesting a qualitative as well as a substantial quantitative change. In discussing how it would decide whether a final solution was adequate, the Court stated:

"The problem of accommodating conflicting interests in surface water cases is most difficult. The court is given general principles but in the final analysis the rule of reasonable use compels the trial court to weigh the various relevant factors and seek to find an equitable accommodation."

*Id.* The full opinion, the language used and the result reached in *Hollingsworth* indicate adherence more to the principles of the reasonable user doctrine rather than those

of natural flow. See 5 Clark, *supra*, § 452.2(A), p. 505, n.2.

Unfortunately, the conclusion last stated is contrary to certain statements in *Pierce Family, Inc. v. Magness Construction Company, supra.* In *Pierce*, the plaintiffs sought review of the Vice Chancellor's denial of their request for an injunction that would force the defendants, lower landowners, to increase the size of drainage pipes they had installed to carry off the water from above them that had its natural drainage course through their land. The pipes were presently adequate for their purpose, but plaintiffs anticipated that, given increased development of upstream land, the waters would be too voluminous for the pipes to handle, and that consequently the waters would back up and flood plaintiffs' land. In deciding the case, this Court noted, with reliance on general authorities, that a lower landowner is obliged to accept the natural flow of waters from higher land upon his own, and may not block the flow so that waters back up, flooding an upper owner's land. The Court went on to state that "[i]t also follows that an upper owner may not artificially increase the flow of water upon lower lands above its natural volume." 235 A.2d at 270. This Court then cited the four Delaware cases just discussed in this opinion as establishing the law of this State in accord with the general authority.

■ Unfortunately, given the situation in *Pierce*, where the denial of the injunction was affirmed because "the fears of the plaintiffs [were] no more than apprehension that at some indefinite time in the future the situation [would] arise" (235 A.2d at 270), there was no need for close scrutiny of the Delaware or general case law. The law is more extensive and complex than this Court suggested in that case. We do not think the unnecessary passing remarks in that brief opinion should be read as an adoption by Delaware of the natural flow doctrine. Rather, the *Pierce* decision should be considered as resting on the sound equitable doctrine that an injunction will not issue by reason of mere apprehension of uncertain speculative damage at an indefinite time in the future. *McQuail v. Shell Oil Company*, Del.Ch., 183 A.2d 581 (1962).

■ We therefore examine the Delaware law free from any characterization that we made in *Pierce*. Our examination of the previous cases has not revealed that any rigid rule governs. Rather, we have found emphasis on the substantiality of the invasion and attention to the reasonableness of defendant's actions as the hallmarks of our law. Moreover, in stating the principle of *Hollingsworth*, this Court in *Pierce* overlooked the distinction that the Chancellor made between increasing the flow of water and increasing the size of the easement, a distinction manifested in his willingness to allow defendants to remedy the situation by laying a completely covered pipe of adequate size. 178 A.2d at 310. As we read the case law, particularly the *Hollingsworth* and *Staats* cases, the reasonable user standard prevails in Delaware in cases concerning interference with the flow of surface water.

We think the courts of this state should continue to look at the facts of each case according to the criteria of the reasonable user standard. While this approach may lack absolute predictability, it is more suited to the realities of modern land use and development. The natural flow rule would be some impediment to the improvement of land, whereas the reasonable user rule would enable those improvements to be made that would not unreasonably burden on the lower owner's interest.

With regard to this case, given the fact that Turkey Run may be considered a natural watercourse, it probably does not matter whether the natural flow rule or the reasonable user rule applies. As has been noted, even those jurisdictions applying the natural flow rule, permit "the flow of diffused surface waters [to] be accelerated or otherwise altered into natural watercourses" so long as the capacity of the watercourse is not overtaxed. 5 Clark, *supra* § 452.2(A), pp. 505–506. But we think Delaware law requires decisions in this area to be made under the reasonable user stan-

dard. We so hold. Accordingly, the judgment entered below should be based on the alternative ground of the Vice Chancellor's opinion, and should be modified to so indicate.

■ There is one other matter that must be considered in this appeal. Appellant Weldin Farms has also raised as a defense to the Glassmans' complaint against the adverse effects of its drainage system the fact that New Castle County approved the plan pursuant to its power under the drainage code, which was enacted by ordinance in 1969 under authority granted by 9 *Del.C.* § 3002, the section allowing it to regulate subdivision and land development within its boundaries. Weldin Farms contends that this County approval of its plan was pursuant to law and not an abuse of discretion and therefore protects it from injunctive relief against carrying out that plan.

The drainage code requires a developer to submit detailed drainage plans for a proposed subdivision to the County for its approval. In 1974 the code was amended adding the standard for approval at § 6.15–1(a)(2) that "[i]nundation of yards, periodic basement flooding is not considered significant damage." Under this language approval was granted to Weldin Farms. We agree with the Vice Chancellor's decision that insofar as the County regulation conflicts with the existing common law of the State it is ineffective and cannot provide a defense against an injunction based on those common law principles. The General Assembly's grant to the County in 9 *Del.C.* § 1101 of "all powers which . . . it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute . . . ." [*Ingersoll v. Rollins Broadcasting of Delaware, Inc.*, Del.Supr., 269 A.2d 217, 219 (1970)] is expressly limited by the statutory provision that:

> "This grant of power does not include the power to enact private or civil law concerning civil relationships, except as incident to the exercise of an expressly granted power . . . ."

9 *Del.C.* § 1101. The § 3002 authorization to the County to regulate subdivision, including, by ordinance, drainage, is not such an express grant of power in these areas. Under the circumstances we must assume, as did the Vice Chancellor, that "such regulation is to comport with the existing law of the State." *Glassman v. Weldin Farms, Inc., supra,* 359 A.2d at 679. It could not have been reasonably intended by the General Assembly that the County, by exercising its authority on subdivision matters, could foreclose a private cause of action which exists under State law. Even with the reasonable user rule, it cannot be said that there is no conflict between the regulations and the common law. The reasonable user rule envisions that the balancing of conflicting interests and any finding of ultimate liability be made on a case by case basis by the Courts rather than by the County's regulatory standards. Inevitably, the County could, in good faith and in the exercise of its sound discretion, approve or disapprove plans that a court might weigh differently with regard to a particular litigant. The current regulatory scheme cannot be read to oust the courts from their proper function in protecting individual property rights. The County's approval of Weldin Farms' drainage plan was not effective, therefore, to foreclose the injunction by the Court of Chancery.

As a closing matter, it has come to our attention that there have been some factual developments not apparent in the record. New Castle County has been considering taking over responsibility for the water detention facility that had been constructed by Weldin Farms on the real estate development involved in this action. Such a take-over would eliminate Weldin Farms' responsibility for the problems complained of, if any remained. It is of no significance to the Glassmans who solves the problem of flooding as long as the problem is solved. Thus far the County has declined to act, apparently reading the Vice Chancellor's ruling to dictate that, even in the absence of an increase in the peak flow, no additional volume is permitted. If, in the light of this opinion, the County should take over

responsibility for the detention system, the resulting elimination of flooding would certainly be an interest to be balanced by the Court of Chancery in its reasonable user analysis.

It follows from the foregoing that the decision of the Court of Chancery must be modified to rest on a reasonable user basis and, particularly, that a new order must issue in lieu of the judgment from which the appeal was taken.

The judgment of the Court of Chancery is modified and the case is remanded for such further proceedings as may be necessary or desirable in light of this opinion and factual developments.