# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LEE ALAN ROBINSON and MARY LEE ROBINSON,<br><br>Plaintiffs,<br><br>v.<br><br>OAKWOOD VILLAGE, LLC, ENVIRONMENTAL CONSULTANTS INTERNATIONAL CORPORATION, GEORGE & LYNCH, INC., G&L HOLDINGS, LLC OAKWOOD VILLAGE AT LEWES, LLC, JOHN PAUL JONES, JR., GARY CUPPELS, BRIAN LESSARD, LESSARD BUILDERS, INC., LESSARD BUILDERS AT OAKWOOD VILLAGE, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 10154-VCG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: January 13, 2017
Date Decided: April 28, 2017

Charles J. Brown, III, Shannon Dougherty Humiston of GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Marc S. Casarino, Nicholas R. Wynn of WHITE AND WILLIAMS LLP, Wilmington, Delaware, *Attorneys for Defendants, George & Lynch, Inc., Oakwood Village at Lewes, LLC, and G&L Holdings, Inc.*

Mary E. Sherlock of WEBER GALLAGHER SIMPSON STAPLETON FIRES & NEWBY, LLP, Wilmington, Delaware, *Attorney for Defendants, Brian Lessard, John P. Jones, Jr., Lessard Builders, Inc. Lessard Builders at Oakwood Village, Inc.*

GLASSCOCK, Vice Chancellor

Delaware, I was taught in the long-ago days of my youth, has no natural lakes. A related geological figure exists, however, scattered across the southern parts of this state and to the south; Delmarva (or Carolina) "bays," features known locally as whale-wallows in those same long-ago and perhaps more poetic times. These are generally elliptical depressions of unknown origin, which have no natural drainage. As a result, many are vernal pools—that is, areas of vegetated wetland soils that fill with water in wet seasons, but are dry much of the year. This case involves such sumps or sinks, in a 63-acre tract of Sussex-County wooded land occupied by the Plaintiffs, Lee and Mary Robinson. The construction of a suburban housing development on land adjacent to the Robinson property has increased surface stormwater discharge, and converted the low areas from vernal pools to more-or-less permanent ponds. The resulting standing water has killed mature timber standing in these low areas—referred to in this record as "sumps"—and has limited the Robinsons' enjoyment of their property.

The Robinsons brought this action seeking damages and injunctive relief against the owners of the neighboring development, known as Oakwood Village, as well as those allegedly involved in the design and construction of the Oakwood Village stormwater system. The case went to trial; what follows is my post-trial Memorandum Opinion. The matter has been the subject of intense litigation effort, and as the six-day trial foreshadowed to the litigants and the presiding judge—and

1

as the reader will discover by weary experience—the resulting record is factually dense. The Plaintiffs have raised numerous legal grounds on which they seek relief. At its heart, however, this dispute is a simple one. It is an action in tort, sounding in nuisance or trespass. The Oakwood Village property in its natural state drains, in part, onto the Robinson property. Development of Oakwood Village has increased the volume of water subject to such drainage. In Delaware, an upstream owner may increase drainage onto his non-consenting neighbor without incurring liability thereby, but only so long as the increase is reasonable—the analysis of which requires a factual inquiry. The issue here is whether the increased drainage, in light of its consequences, is reasonable. I find that it is not, and for the reasons that follow, I find that the Robinsons are entitled to relief.

This Memorandum Opinion concerns itself only with liability, and not the resulting damages or equitable relief. While the trial addressed damages, the injunctive relief the Robinsons seek will necessarily affect homeowners in Oakwood Village who are not parties here. I cannot fully balance the equites, as required before crafting injunctive relief, without a record upon which to consider their interests. Obviously, the type of equitable relief ordered will have a direct impact on the permanency of the damage to the Robinsons' real property, and thus the quantum of damages to which they are entitled. I note that equitable relief here could include many options to alleviate the problems caused by the drainage, in addition

2

to an injunction to halt the unreasonable discharge of water. In other words, this is a matter especially suited to a negotiated solution, rather than judicial fiat. I have long encouraged the parties in this regard, without success; it is my hope that, with this decision, the parties will have sufficient information as to the likely result of further litigation to settle the remaining matter instead of pursuing that litigation.

## I. FACTS

The following are the background facts as I find them by a preponderance of the evidence following a six-day trial.[1]

### A. *The Current and Former Parties*

The Plaintiffs, Lee Alan Robinson and Mary Lee Robinson (together the "Robinsons"), own an approximately 63-acre parcel of land in Sussex County, near Conley's Chapel outside of Lewes (the "Robinson Property"). The area is in transition from rural to suburban. The Robinsons live on the Robinson Property, the bulk of which is undeveloped woodland. The Robinson Property is identified in Sussex County Tax Map No. 234-11.00 as Parcels 40.00, 40.01, 40.02, 40.03, and 41.00.[2] The Plaintiffs have owned and resided on their property since 1982.[3]

---

[1] Additional factual findings, to the extent they are needed, are discussed in the relevant analysis sections. The findings herein are by a preponderance of the evidence as shown at trial, and referenced in the parties' post-trial submissions.

[2] Pretrial Stip. 5.

[3] *See id.*

There were a substantial number of Defendants in this action, some of which have been dismissed. Each remaining Defendant and certain former Defendants are described below.

Defendant Oakwood Village at Lewes, LLC ("Oakwood Village LLC") is a Delaware limited liability company initially formed by Defendant Brian Lessard and his brother, Colin Lessard (Colin is not a party to this litigation).[4] Brian Lessard and his brother were the original members of Oakwood Village LLC, forming the entity on March 10, 2005.[5] Oakwood Village LLC has been primarily responsible for developing the Oakwood Village community (I will refer to the property on which the development was created as the "Oakwood Village Site"). The Oakwood Village Site, formerly the "Mocci Property," is an approximately 63-acre parcel adjacent to the Robinson Property. Oakwood Village LLC purchased the Oakwood Village Site in January 2006 and at all relevant times has owned the Site.[6] On July 2, 2007, Lewes Property Development, LLC acquired a 50% membership interest and the Lessard brothers' stake in Oakwood Village LLC was reduced to 35% for Brian Lessard, and 15% for Colin Lessard.[7] By November 7, 2012, Lewes Property

---

[4] Trial Tr. 1152:5–11 (B. Lessard).
[5] Pretrial Stip. 11.
[6] *See* JX156; JX157. I note that ownership stakes in the entity Oakwood Village LLC have changed several times since formation.
[7] Pretrial Stip. 19.

Development, LLC became the sole member of Oakwood Village LLC.[8]  Brian and Colin Lessard were no longer members after this date.[9]

Defendant George & Lynch, Inc.  ("George & Lynch," and together with Oakwood Village LLC, the "Oakwood Village Defendants") is a contractor for the development, Oakwood Village LLC.[10]  George & Lynch never directly held an ownership stake in the Oakwood Village Site.[11]  In the course of its site work George & Lynch received several notices about deficiencies in the construction process of the stormwater ponds.[12]  That is, the Oakwood Village Site and work on stormwater facilities was, at various times, "out of compliance."[13]  The Department of Natural Resources and Environmental Control ("DNREC") directly notified two principals of George & Lynch of "violations" on the Oakwood Village Site in 2014, including discharge of sediment-laden water, and failure to monitor and repair erosion and sediment controls.[14]

Defendant Lessard Builders, Inc. ("Lessard Builders") is a construction business controlled by the Lessard family, and was involved in the development of

---

[8] *Id.* at 20.
[9] *Id.*
[10] *See* JX002 ¶ 4.
[11] Trial Tr. 1153:3–16 (B. Lessard).
[12] *See, e.g.*, JX206; JX207; JX235.
[13] *See, e.g.*, JX235 at 1.
[14] *See* JX237 at 1.  *See also* JX235 at 4 (identifying Messrs. McGuigan and Dinger as George & Lynch representatives).

the Oakwood Village Site.[15] Lessard Builders actively but unsuccessfully pursued purchasing the Robinson Property for upwards of $4 million.[16]

Defendant Brian Lessard formed Defendant Oakwood Village LLC in 2005.[17] He formed Oakwood Village LLC prior to acquiring the Oakwood Village Site. Brian Lessard is also the president and an owner of Lessard Builders and has been at all relevant times.[18] Brian Lessard, through his positions, oversaw the initial development of the Oakwood Village Site.[19]

Defendant J. Paul Jones, Jr. is a professional engineer with experience in water resources, and was the project manager for Lessard Builders in the development of the Oakwood Village Site.[20] He worked for Lessard Builders from June 2004 through May 2011.[21] He did not design the stormwater management system for the Oakwood Village Site.[22] He was never an owner of Lessard Builders nor Oakwood Village LLC.[23] Jones did, however, communicate with the Robinsons in his role at Lessard Builders.[24] Specifically, he presented the Robinsons with a letter in 2006

---

[15] *See* JX176 (listing Lessard Builders on a May 2005 permit application for Oakwood Village). I note a former Defendant with a similar name, Lessard Builders at Oakwood Village Inc., has since been dismissed. *See* Trial Tr. 1155:21–24 (B. Lessard). That entity is not a valid corporation. *See id.*

[16] *See* Pretrial Stip. 9, 12. The sale never materialized.

[17] *See* Trial Tr. 1152:5–8 (B. Lessard).

[18] *See id.* at 1110:21–1111:8 (B. Lessard).

[19] *See id.* at 1112:21–24 (B. Lessard); *id.* at 1118:1–6 (B. Lessard).

[20] *See id.* at 1179:12–20 (Jones); *id.* at 1170:5–1173:22 (Jones); JX176 at 1–2.

[21] Trial Tr. 1167:7–12 (Jones).

[22] *See id.* at 1216:24–1217:3 (Jones).

[23] Pretrial Stip. 9.

[24] *See* Trial Tr. 1181:4–6 (Jones).

6

that indicated that the discharge rates would *not* change upon the development of the Oakwood Village Site.[25]  I refer here to Jones, together with Lessard Builders and Brian Lessard, as the "Lessard Defendants."

Dismissed Defendant Environmental Consultants International Corporation ("ECI") is the entity that primarily developed and engineered a stormwater management plan (the "Stormwater Management Plan" and as built the "Stormwater Management System") for the Oakwood Village Site on behalf of the developers Lessard Builders and Oakwood Village LLC.[26]  ECI ceased operations in 2007,[27] and was dismissed from this action on November 29, 2016 along with Gary Cupples.

Dismissed Defendant Gary Cupples was an officer at ECI, holding at one point, the title of President.[28]  He continued to consult on the Oakwood Village Site project after ECI ceased operations.[29]  Cupples is both a professional engineer, and a land surveyor and was involved in facilitating certain studies necessary for receiving approval of the Stormwater Management Plan.[30]

---

[25] *Id.* at 1188:22–1190:7 (Jones).  *See id.* at 1219:9–23 (Jones); JX160.
[26] *See, e.g.*, JX155; JX161.
[27] Trial Tr. 1282:7–13 (Cupples).
[28] *Id.* at 1271:24–1272:1 (Cupples).
[29] *See id.* at 1282:7–23 (Cupples).
[30] *See id*. at 1287:20–22 (Cupples); *id.* at 1264:1–11 (Cupples).

7

*B. The Relevant Properties and Events*

      1. <u>The Robinson Property</u>

The Robinsons own a 63-acre homestead near Conley's Chapel outside of Lewes where they have lived since 1982. The northeast corner of the Robinson Property abuts the southwest border of the Oakwood Village Site. The Robinson Property is roughly displayed in figure 1 below, oriented with north at the top.[31]

---

[31] The map below can be found at JX265 Ex. 7. It is attached to orient the readers to the complicated description of the various "Sumps."

**Figure 1**



The Robinson Property is primarily undeveloped forest but contains certain "jurisdictional" and non-jurisdictional wetlands.[32] Before development of Oakwood Village, certain portions of the Robinson Property were seasonally wet, and ponding would, at times, occur naturally.[33] Long-lasting standing water on the property was historically rare, however. An expert retained by the Robinsons testified that seasonal ponding was the result of typically wet conditions in the fall/winter seasons.[34]

The lowest point on the Robinson Property is at an elevation of eighteen feet above sea-level, whereas the highest point is at thirty-four feet.[35] The Robinsons created a walking trail circling the property in approximately 2006, and the Robinsons, particularly Mrs. Robinson, enjoyed walking the property.[36] Mrs. Robinson would occasionally walk up to the Oakwood Village Site and observed increases in ponding beginning in 2014.[37]

---

[32] *See* JX262 at 14. The distinction between a jurisdictional and non-jurisdictional wetland appears to be that wetlands subject to Army Corp of Engineering oversight are "jurisdictional wetlands." *See, e.g.*, JX121.

[33] *See* Trial Tr. 60:15–21 (Philipp).

[34] *See id.* at 73:10–16 (Philipp).

[35] Pretrial Stip. 6.

[36] *See* Trial Tr. 1029:14–1030:21 (M. Robinson). Mrs. Robinson further testified that while water would occasionally pond it would not last long, and "[i]t never was to the extent that we have seen since 2014. It was never a question of wearing hip boots and waders before." *See id.* at 1031:6–17. (M. Robinson).

[37] *See id.* at 1029:14–1030:21 (M. Robinson).

Mr. Robinson, who I found credible, testified that in his hundreds of hours walking the property prior to the development of the Oakwood Village Site, he "never saw water flow over the ground."[38] Certain portions of the property, however, would fill with ponded water, periodically. An area referred to as "Sump A" located in the north-central portion of the property would periodically contain water in the event of major storms or seasonally.[39]

A photo taken by the Robinsons' daughter on December 21, 2008[40]—that is, before the Oakwood Village Stormwater Management System was completed— shows what such water accumulations in Sump A-3 or the "main basin,"[41] would look like.[42] The photo is reproduced in figure 2 below.[43]

---

[38] *Id.* at 925:6–10 (L. Robinson).
[39] *See id.* at 916:16–22 (L. Robinson).
[40] JX349.
[41] Trial Tr. 876:12–877:4 (J. Robinson).
[42] *See* JX220.
[43] *See id*.

**Figure 2**



The water appears, at most, about one foot deep, and the photo shows a steady-cover of dry, undisturbed, leaves surrounding the ponded area—thus the leaves that had fallen that fall were not saturated and the photo shows the maximum water level as of that date for the fall/winter season.[44] However, the photo also shows higher water marks on the trees evincing that at some previous time, prior to the trees losing their leaves in the fall of 2008, the ponded area had temporarily reach a depth of approximately two to three feet.[45] The record reflects that the same area in the photograph above was "dry" with "*no water*" by the spring of 2009.[46] An area

---

[44] *See* JX220; Trial Tr. 74:22–76:14 (Philipp).
[45] *See* JX220.
[46] *See id.*

referred to as "Sump B" would not historically have water pooled on it.[47] Specifically, the Robinsons had a shooting range constructed in the area of Sump B that they would frequent over the years, and they did not previously encounter standing water in that area for any appreciable time.[48]

In the course of development of Oakwood Village, as mentioned above, there was a proposal to acquire the Robinson Property by Brian Lessard for $4 million.[49] Even though Brian Lessard made a $2,000 deposit, the sale ultimately fell through, because, in part, of the way Lessard proposed to structure the deal.[50] During the period in which the sale appeared promising, the Robinsons cooperated with and signed off on certain steps needed to develop Oakwood Village.[51]

The Robinson Property has a well for drinking water, installed at an unknown date.[52] The well has not been replaced nor has maintenance been performed on the well since the Robinsons purchased the property in 1982.[53] The well is forty-four feet deep, however, DNREC currently recommends wells for potable water be a

---

[47] *See, e.g.*, Trial Tr. 872:4–873:12 (J. Robinson).
[48] *Id*. at 872:12–873:12 (J. Robinson).
[49] *Id.* at 919:2–8 (L. Robinson).
[50] *Id.* at 923:6–924:2 (L. Robinson).
[51] *See, e.g.*, *id*. at 924:3–925:10 (L. Robinson) (testifying regarding a February 14, 2006 letter (JX160) that there "were a lot of papers flying around at the time, and it looks like something that I would sign"). Mr. Robinson, however disputes signing certain documents—specifically a March 9, 2006 letter (JX168). *See* Trial Tr. 925:11–928:11 (L. Robinson).
[52] Pretrial Stip. 6.
[53] *Id.*

depth of at least one hundred feet.[54]  Additionally, the Plaintiffs' septic field is less than one hundred feet from their well.[55]  The Plaintiffs allege in this litigation that runoff from Oakwood Village has degraded their well water, causing it to smell of rotten eggs, and necessitating the purchase of bottled water.[56]

### 2. Development of Oakwood Village

Oakwood Village LLC purchased the Oakwood Village Site in January 2006.[57]  At all times relevant to liability Oakwood Village LLC has owned the Oakwood Village Site.  Prior to development the 63-acre Oakwood Village Site was mostly wooded.[58]  The Oakwood Village Site is identified in "Sussex County Tax Map No. 234-6 as Parcels 22 and 23."[59]  Actual development of the site started in 2007, and no homes were built prior to 2007.  From July 2007 to May 2015 approximately seventy homes were built at the Oakwood Village Site, with 115 single-family homes expected upon completion of the development.[60]  Below, the evolution of the development is reviewed.

---

[54] *Id.* at 7.
[55] *Id.*
[56] *See* Pls' Post-Trial Opening Br. 61.
[57] JX156; JX157. The purchase was financed via a $4.325 million mortgage from Wilmington Trust.  *See id.*
[58] *See* JX359.
[59] Pretrial Stip. 7.
[60] *See id.*; JX260; JX265.

14

### a. Pre-Development Negotiations and Early Development

In June 2004, Lessard Builders retained ECI to perform professional engineering and surveying services.[61] ECI was tasked with, among other things, "designing and preparing a Stormwater Management Plan for the Oakwood Village Site."[62] As part of this process ECI was to secure approval of the site's Stormwater Management Plan from the Sussex Conservation District.[63] ECI, via Gary Cuppels, worked with and ultimately retained Environmental Resources, Inc. ("ERI") to assist in evaluation of the Oakwood Village Site's wetlands.[64] ERI provided a preliminary Wetland Delineation Report to ECI on August 12, 2004, for the Oakwood Village Site.[65]

Soil investigation by Atlantic Resource Management Inc. ("ARM") of the Oakwood Village Site to assess waste water issues began as early as June 22, 2004.[66] Mr. Jones of Lessard sent information regarding the *Robinson* Property to ARM in August of 2004,[67] and on September 10, 2004, Mr. Jones accompanied an ARM employee on a site visit to the Robinson Property "to evaluate the Robinsons' Property for potential waste water disposal areas."[68]

---

[61] *See* JX109.
[62] Pretrial Stip. 8.
[63] *Id.*
[64] *See id.* at 8–9.
[65] *See* JX112.
[66] Pretrial Stip. 8.
[67] JX114.
[68] Pretrial Stip. 9.

15

By November 3, 2004, ECI via Mr. Cupples submitted a request for regulatory review known as a "PLUS Review Request" to the State of Delaware proposing a 116 lot development on the Oakwood Village Site.[69]   Shortly thereafter, on November 12, 2004, Lessard Builders submitted a written proposal, signed by Brian Lessard, to acquire the Robinson Property for $4 million.[70]   The same day as the written proposal, Lessard Builders made an initial deposit of $2,000.00 on the Robinson Property.[71]   The offer, however, was contingent on a feasibility study.

After this initial offer, due diligence work on both the Oakwood Village Site and the Robinson Property continued.   At a December 1, 2004 "project review meeting," attended by Cupples of ECI, "various state agencies considered the PLUS Report" that ECI had submitted for the development of the Oakwood Village Site.[72]

On December 7, 2004, Cupples sent a memorandum concerning cost over-runs to Jones of Lessard Builders, which stated

> [w]ith regard to concept stormwater management; *this issue speaks for itself in that the Mocci [Oakwood Village] site is difficult to address in terms of stormwater management* and an effort to address the stormwater management issues up front, was made by our firm so as to assure the client that a workable stormwater management system could be affected [sic] for the project site.  The costs overruns on this issue, again, based upon estimated fees, were extended due to site conditions that could not be anticipated at the time that the proposal was prepared.[73]

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* at 10; JX136.
[73] JX117 at 2 (emphasis added).

Also on December 7, 2004, ECI officially retained ERI to assess the Robinson Property.[74] Mr. Launay of ERI provided a preliminary delineation map of the wetlands on the Robinson Property to Cupples in December, 2004.[75] The December 2004 ERI map and report indicated there were approximately ten total acres of wetland property on the Robinson Property.[76] Also in December 2004, the State of Delaware Office of State Planning Coordination wrote Mr. Cupples a letter to follow up on the PLUS Report he submitted, and the December 1, 2004 meeting.[77] Under the DNREC comment portion of the letter, DNREC indicated that "[t]his project should not be approved without significant changes."[78] The DNREC comment continued that "[e]ach stormwater management facility should have an adequate outlet for release of stormwater."[79]

In January 2005 "ARM installed three groundwater observation wells on the Robinsons' Property."[80] Communications reflect that Jones, Cupples, and Brian Lessard discussed "creating a storm water disposal easement" on the Robinson

---

[74] *See* JX118.  During this time frame, on December 10, 2004, ARM submitted letters to federal and state agencies requesting such agencies review the Robinson Property.  Pretrial Stip. 10.

[75] *See* JX121; Pretrial Stip. 10.

[76] JX121.  Only half of such wetlands were identified at the time as subject to Army Corp of Engineering oversight—as so called jurisdictional wetlands.  *See id.*

[77] JX122.

[78] *Id.* at 3.

[79] *Id.* at 6.

[80] Pretrial Stip. 10.

Property in January 2005 as well.[81]  Diligence work continued by various contractors and on May 6, 2005, Mr. Jones prepared a letter for the Robinsons regarding Lessard Builders' proposal to purchase their land.[82]  However, Lessard Builders amended its purchase proposal from the terms previously presented to the Robinsons.[83]  Specifically, they now proposed that the $4 million purchase of the Robinson Property would be conducted in two phases.[84]  The Robinsons ultimately determined, after consultation with counsel, "that a two phased approach to purchasing their property was not in their best interest," and no sale of the property occurred.[85]

Field work continued on the Robinson Property through 2005 and 2006. Various contractors from ECI and ARM performed soil tests and collected data on the Robinson Property in the fall of 2005.[86]  On May 17, 2005, ARM informed ECI that there were some problematic soil conditions on the Oakwood Village Site and that due to the high water table, previously-contemplated infiltration ponds—which discharge stormwater into the ground—were "generally not suitable."[87]  Further, ARM stated the seasonally-high water table, often at depths of less than thirty inches

---

[81] JX126.
[82] JX130.
[83] *See* Pretrial Stip. 12.
[84] *Id.*
[85] *Id.*
[86] *Id.* at 13.
[87] JX131.

beneath the soil surface, was "problematic for siting stormwater management structures when no outlet/outfall structure is available."[88]  A May 24, 2005 memorandum by ECI indicated the Stormwater Management Plan, as of that time "[a]ssume[d] outlet to wetland, no detention."[89]  Shortly thereafter, a change work order was prepared which indicated that ECI would now expand the Oakwood Village Site research to include the Robinson Property.[90]  By mid-June 2005, Lessard Builders submitted to the Robinsons amended purchase contracts laying out the two-phase purchase which, as described above, the Robinsons later rejected.[91] As of this time, however, the Robinsons remained active participants in pursuing the development.[92]  The Robinsons retained ECI and ARM to conduct soil tests on their property to facilitate the feasibility study regarding a potential sale to Lessard Builders.[93]  Certain fees for such diligence work were paid directly by the Robinsons.[94]

In the fall of 2005, Brian Lessard submitted a Sediment and Stormwater Management Plan to the Sussex Conservation District for the Oakwood Village Site.[95]  The narrative section indicated that an area called "sub-catchment 1S,"

---

[88] *Id.*
[89] JX133.
[90] JX134.
[91] *See, e.g.*, JX135; JX141.
[92] *See id.*
[93] *See* JX141; JX142; Pretrial Stip. 13.
[94] *See, e.g.*, JX172 at 2.
[95] JX147.

located in the northern part of the Oakwood Village Site, drained northwest away from the Robinson Property, but that the bulk of the Site "generally drains to the south."[96] Additionally, the submitted plan stated that a "[c]opy of [a] recorded permanent easement when stormwater facility or outfall is located outside of property boundary" was "n[ot] a[pplicable]."[97] This is despite Mr. Cupples informing Lessard Builders, specifically Brian Lessard and Mr. Jones, that there was a need to obtain a formal easement from the Robinsons.[98] Finally, this initial plan indicated that development would result in a *decrease* in the peak discharge rate from the Oakwood Village Site for 2-year and 10-year storms.[99]

The Sussex Conservation District responded on December 9, 2005, pointing out numerous problems with the Stormwater Management Plan, including the inability to verify soil classifications and certain elevation/contour issues.[100] ECI subsequently submitted a formal addendum in January 2006.[101] The Sussex Conservation District, via Edward Bender, a "Stormwater Engineer," informed ECI that certain changes would need to be made to the Stormwater Management Plan.[102] Specifically, Bender indicated that the plan improperly summed the discharges from

---

[96] *Id.* at Narrative 1, 3.
[97] *Id.* at Checklist.
[98] Trial Tr. 1287:8–19 (Cupples).
[99] JX147 at Narrative 6.
[100] *See* JX151.
[101] JX155.
[102] *See* JX158.

two different points to indicate a net decrease in flow, without indicating how point discharge itself would be affected.[103] Bender also asked certain follow up questions including whether there were existing water courses that could safely convey a 100 year storm discharge, and where runoff from the Oakwood Village Site would "eventually discharge."[104]

In January 2006, Oakwood Village LLC formally acquired the Oakwood Village Site.[105] Throughout the spring of 2006 diligence work continued on both the Robinson Property and the Oakwood Village Site.[106] On February 14, 2006, Mr. Robinson signed a letter to the Sussex Conservation District that was drafted by ECI, who the Robinsons had formally retained that same day for further soil and water studies.[107] The letter signed by Mr. Robinson was sent to the Sussex Conservation District in support of the Oakwood Village Site development, and the Stormwater Management Plan.[108] The letter stated that Mr. Robinson was aware that water would discharge from a retention pond onto his property but that discharges "*will be*

---

[103] *See id.*
[104] *See id.*
[105] *See* JX156; JX157.
[106] *See* Pretrial Stip. 16.
[107] *See* JX159; JX160.
[108] *See* JX160.

21

*no greater than the existing discharges that currently flow to the west.*"[109]  The letter

further indicated that "only the discharge point (not the discharge)" will change.[110]

On February 20, 2006, ECI responded to Mr. Bender of the Sussex

Conservation District to address the concerns that he raised earlier that month.[111]

ECI indicated again that there would be a *decrease* in discharge onto the Robinson

Property when the point of analysis is moved and observed that there are no defined

watercourses directly downstream from the Oakwood Village Site.[112]

On March 9, 2006, Bender wrote ECI to follow up on information "concerning

drainage patterns along the west and southwest boundaries of the proposed

development" and thanked ECI "for the letter dated 2/14/06 from Lee Robinson."[113]

The letter Bender was referencing was that signed by Mr. Robinson, indicating that

the discharge point, but not the total discharge would change.[114]  The March 9, 2006

Bender letter from the Sussex Conservation District conveys detailed information

regarding discharge rates.[115]  Specifically, the letter states that "[t]he District

requests *that you clarify with Mr. Robinson* that the discharge from Pond 4 will

*increase* at the Robinson property boundary from 0.02 cfs (pre) to 0.47 cfs (post)

---

[109] *Id.* (emphasis added).
[110] *Id.*  Mr. Robinson testified that he probably signed this letter, but does specifically recall.  Trial Tr. 924:8–925:10. (L. Robinson).
[111] JX162.
[112] *Id.* at 1–2.
[113] JX163.
[114] *See* JX160.
[115] JX163.

22

during the 2 year storm and up to 4.31 cfs from 0.61 cfs during the 10 year storm."[116] The letter continues that if the point of analysis is moved 500 feet *onto* the Robinson Property and that when reductions from other flows from an adjacent property are factored in—the cumulative "discharge" would slightly decrease.[117] Bender's March 9, 2006 letter instructs ECI to "[p]lease confirm that Mr. Robinson is aware of the above information" and indicates that "[i]f he is agreeable, this stormwater submittal can be recommended for approval."[118] Mr. Bender testified that his intent in sending this letter was to confirm that Mr. Robinson was aware of the facts concerning the discharge.[119]

On March 16, 2006 ECI responded to Bender at Sussex Conservation District.[120] Bruce Horne of ECI[121] informed Bender that ECI "presented [the March 9, 2006] letter to Mr. Robinson and he signed it to indicate he read it and understood its contents."[122] Attached to ECI's response was a copy of the March 9, 2006 letter with a signature at the bottom margin (the "March 9 Signature").[123] The March 9 Signature appears to be Mr. Robinson's signature;[124] however, there is a dispute as

---

[116] *Id.* (emphasis added).
[117] *Id.*
[118] *Id.*
[119] Trial Tr. 1067:14–1068:8 (Bender).
[120] JX168.
[121] Who is deceased.
[122] JX168.
[123] *Id.* at 3.
[124] *See* Trial Tr. 952:19–954:8 (L. Robinson).

to whether the signature was copied or forged onto the document. I note that the executed version of the March 9 Signature is on a document that had been faxed at least twice—with one such fax leaving an office of a business owned by Lessard.[125] Mr. Robinson disputes signing the document, however no other signatures produced in this litigation appear to match precisely the March 9 Signature, cutting against any supposed copying and pasting it onto the document.[126] While I trust that Mr. Robinson does not remember signing the letter, I note this was during a period of time where it appeared his property was going to be purchased by Lessard Builders.[127] The signature appears authentic, and while certain circumstances create *some* doubt, there has been an insufficient showing for me to conclude it was, in fact, forged. I find, however, that the signature on this document falls well short of demonstrating a knowing waiver of the Robinsons' right to object to an unreasonable discharge from Oakwood Village, as discussed below.

Following an addendum, and clarification on factual issues from Mr. Cupples and ECI, the Sussex Conservation District approved the Stormwater Management Plan for the Oakwood Village Site on March 23, 2006.[128] Oakwood Village had not

---

[125] *See* JX168 at 3.

[126] *See*, *e.g.*, Post-Trial Brief on Behalf of Oakwood Village at Lewes, LLC and George & Lynch Inc. ("OVAL Post-Trial Answering Br.") 25 (collecting signatures).

[127] *See, e.g.*, Trial Tr. 1213:1–1214:23 (Jones) (testifying the feasibility study period had not yet run at the time of the March 9 Signature and Lessard Builders had not informed the Robinsons that they would not purchase the property).

[128] Pretrial Stip. 16.

at the time obtained a stormwater easement from the Robinsons. While Mr. Cupples testified that he informed Brian Lessard and Mr. Jones that such an easement was needed; no such easement was ever secured.[129]

William Schab, Esquire, contacted Lessard Builders' attorney on behalf of the Robinsons on April 4, 2006.[130] Schab was retained by the Robinsons to counsel them on a transaction with Lessard Builders, and negotiate on their behalf for the purchase of their property. Schab indicated that his clients "are anxious to finalize the process" and asked Schab "to get involved and to respond to [Lessard Builders'] most recent proposed contract" and sought a $500,000 deposit within the next sixteen months.[131] Later in 2006, Brian Lessard presented a utility easement to the Robinsons regarding treatment of wastewater—not the stormwater at issue here— for the Oakwood Village Site, which the Robinsons never executed.[132] A final Stormwater Management Plan was submitted back to Sussex Conservation District over Brian Lessard's signature on December 14, 2006, with an affirmation that the property would be developed consistent with the submitted plan.[133]

Before construction began, Oakwood Village LLC underwent an ownership shift—Lewes Property Development, LLC acquired a 50% membership interest and

---

[129] *See* Trial Tr. 1286:22–1287:19 (Cupples).
[130] JX172.
[131] *Id.*
[132] Pretrial Stip. 18.
[133] *Id.*

the Lessard brothers stake was reduced to 35% for Brian Lessard, and 15% for Colin Lessard.[134]

### b. Oakwood Village Construction

Construction started in the Summer of 2007. On July 9, 2007, George & Lynch sent the Sussex Conservation District a "revised sequence of construction" which indicated that pond 4 is "the only outlet for the project."[135] In other words, the Stormwater Management System for the entire Oakwood Village Site would discharge all stormwater that entered the system, absent evaporation or infiltration, from pond 4, which is directly adjacent to the Robinson Property. In August 2007, George & Lynch began site work on the Oakwood Village Site.[136] Also in August 2007 Jones of Lessard Builders acknowledged in an email regarding stormwater pond issues that there is "no existing confined ditch or stream that leaves the site."[137] Shortly thereafter, ARM circulated a memorandum to Lessard Builders indicating that all of the ponds collecting stormwater runoff for the Site "are connected by pipes and discharge to the surface near the Robinson property line since there is no natural outfall (ditch, stream, etc.) at the site."[138]

---

[134] *See id.* at 19.
[135] *See* JX199 at 1–2.
[136] Pretrial Stip. 19.
[137] JX204.
[138] JX205.

By July 31, 2008 the stormwater retention basins for the Oakwood Village Site were generally installed, but not yet fully functional.[139] The system is designed as a series of interconnected basins to collect water and sediment along with an attempt to control discharge. Precipitation from the entire Oakwood Village Site that is not otherwise absorbed into pervious surfaces is captured in the stormwater system, and stored in ponds to dissipate without outlets to any watercourse or drainage ditch. When these storage basins overflow, as they have with some frequency, they do so onto the ground near the Robinson boundary, and the water then flows in sheets overland to the low areas of the Robinson Property.

Brian Lessard transferred responsibility for the Oakwood Village Site from Lessard Builders to Oakwood Village LLC effective as of August 7, 2008.[140] Photographs and videos in the record reflect that as late as 2014 construction and site work was occurring on the portion of Oakwood Village abutting the Robinson Property.[141] Further, George & Lynch posted photographs on Facebook in 2013 showing earth-moving site work that it was performing at Oakwood Village.[142] Aerial photos show Oakwood pond 4 dry as late as March 2012.[143]

---

[139] *See* Pretrial Stip. 19; JX353.
[140] *Id.* at 20.
[141] *See generally* JX251; JX251A.
[142] *See* JX377.
[143] JX353.

### 3. Flooding and Run-off Increases

On December 21, 2008, the Plaintiffs' daughter took the photograph of ponding water in the north-central portion of Plaintiffs' property, displayed above.[144] The lines on the trees depict the maximum flood height at "historic flood levels."[145] Standing water on the Robinson Property in 2008, however, was seasonal and contained in certain limited areas.

In the summer of 2014, several significant rain storms passed through southern Delaware—specifically, in July and August several multi-inch rains occurred.[146] The Robinsons initiated this action in September 2014.

Prior to the start of this action, on July 11, 2014, Jason Wardrup, the Robinsons' son-in-law, walked the Robinson Property with Jim Elliot from the Sussex Conservation District.[147] Wardrup testified that he witnessed large amounts of sediment-laden water flowing off the Oakwood Village Site onto the Robinson Property.[148] Photos taken that day demonstrate water overwhelming a silt-fence, and flowing in sheets onto the Robinson Property, past healthy trees.[149] The water flowed with sufficient force to cut trenches and swales into the ground.[150] Water has

---

[144] *See* JX220; Figure 2.
[145] *See* Trial Tr. 894:24–895:10 (J. Robinson).
[146] *See* Pretrial Stip. 21.
[147] Trial Tr. 778:21–781:18 (J. Wardrup).
[148] *See id.*
[149] *See, e.g.*, *id.*; JX251 at July 11, 2014 photographs.
[150] *See* JX251 at July 14, 2014 photograph.

discharged from the Oakwood Village Stormwater Management System with sufficient force, and at sufficient depths to, on at least one occasion, sweep a medium sized fish onto the central portions of the Robinson Property.[151]

DNREC issued several notices that the Oakwood Village Site was "out of compliance" throughout the summer and fall of 2014, and included in certain reports photos of the trenches created by stormwater in berms on the Oakwood Village Site.[152] By February 25, 2016 DNREC fined Oakwood Village LLC for violating sediment and stormwater regulations, and regulations governing the control of water pollution.[153] Specifically, DNREC determined that Oakwood Village LLC failed "to report the discharge of sediment-laden water;" failed "to timely stabilize a stormwater conveyance swale;" failed to "conduct inspections of erosion and sediment controls and stormwater maintenance practices" after rainfall; failed "to maintain the written records for erosion and sediment control review on the site;" and finally violated the administrative code by "blatantly compromising sediment controls permitting sediment-laden water to flow off the premises to an adjacent property and failing to timely repair an overwhelmed perimeter silt fence."[154] The basis for these findings included on-site visits as well as prior reports that detailed

---

[151] *See id.* at Oct. 22, 2014 photographs; Trial Tr. 798:4–799:3 (J. Wardrup).
[152] *See, e.g.*, JX235. *See also* JX236; JX237; JX241.
[153] *See* JX250.
[154] *Id.* at 3.

29

problems that remained uncorrected.[155]  Due to DNREC's conclusion that Oakwood

Village LLC violated several "statutory and regulatory provisions," DNREC issued

an administrative penalty of $36,900, along with costs incurred in the investigation

of $5,535.[156]

Aerial photos show the progress of the development of the Oakwood Village

Site.[157]  The ponds closest to the Robinson Property line were still empty in 2012.[158]

By contrast, the Oakwood Village Site stormwater system in the winters of 2014 and

2015 discharged near the Robinson boundary almost continuously—even when

there was little precipitation.[159]  Water discharges from pond 4 into a small

catchment basin, pond 4A,[160] the pond closest to the Robinson-Oakwood property

line.[161]  While all the ponds are connected, there is only one positive outfall, from

4A.  The discharged water moves across the property line, not in a defined channel,

but rather in "sheets of water moving across the ground."[162]  The water then enters

the sump areas on the Robinson Property and ponds.

---

[155] *Id.* at 2–3.
[156] *Id.* at 3.
[157] *Compare* JX358; JX359 (pre-development) *with* JX352; JX353 (post-development).
[158] *See* JX353.
[159] Trial Tr. 829:18–830:15 (J. Wardrup).
[160] A smaller pond directly adjacent to the larger pond 4, and the closest stormwater facility to the Robinson Property—nearly abutting it.  *See* Figure 1.
[161] *See* Trial Tr. 913:6–16 (L. Robinson); JX251; JX251A.
[162] Trial Tr. 913:6–16 (L. Robinson).

The expert testimony regarding flow onto the Robinson Property is voluminous, and often conflicting. To the extent expert testimony is needed to resolve the reasonableness of the discharge onto the Robinson Property, I find particularly helpful the work performed by Plaintiffs' expert, Mr. Launay. Launay had the opportunity to observe the Robinsons Property closely in 2004 and 2005, prior to the alleged damages from the Oakwood Village Site, and again upon the start of this litigation following the alleged changes. Launay, who I found credible on this point, testified that conditions were "dramatically different" when he returned to the site in 2015 following the completion of the Oakwood Village Stormwater Management System.[163] Launay further testified to observing water discharging from pond 4A, adjacent to the Robinson Property line, "in a shallow spread of water flowing at the surface, and there was quite a bit of evidence in terms of disturbance of leaf litter and disturbance of the forest floor, different things that would denote to me that significant volumes of water had gone . . . across the Robinsons' property and discharged towards sump A."[164] I note that the Defendants' expert, Mr. Christenbury, also testified to certain volumetric increases in discharge onto the Robinsons Property.[165]

---

[163] *See id.* at 236:11–238:2 (Launay).
[164] *Id.*
[165] *See, e.g.*, *id.* at 475:10–476:21 (Christenbury).

## II. PROCEDURAL HISTORY

The procedural history of this matter is rather winding. The following summary is sufficient to the remaining issues before me.

By stipulation of the parties, there are several Counts that remain to be decided against five Defendants.[166] The remaining Counts are for trespass or nuisance, timber trespass, negligence, and fraud.[167] Each remaining Count is alleged against all remaining Defendants, except for the fraud claim that was not brought against George & Lynch.[168] This post-trial Memorandum Opinion addresses the remaining Counts on the issue of liability only.[169]

## III. ANALYSIS

The Plaintiffs bear the burden of proving each element of their claims, including damages, by a preponderance of the evidence.[170] "Proof by a preponderance of the evidence means proof that something is more likely than not."[171]

*A. Liability*

---

[166] Dkt. No. 285.

[167] *Id.* I note that at conclusion of post-trial oral argument I found that the unjust enrichment allegations pled in this action are properly considered subsumed within the trespass allegations. *See id.* at 2–3; Draft Nov. 29, 2016 Oral Argument Tr. at 96–102.

[168] Dkt. No. 285.

[169] I note that at closing argument the Plaintiffs agreed that the only actionable issue present in this case is the discharge of water onto their property. Draft Nov. 29, 2016 Oral Argument Tr. at 14–15.

[170] *See Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015).

[171] *Id.* (citation omitted).

The Robinsons contend that they have been harmed by the discharge of water from Oakwood Village. They seek recovery for this harm via tort—nuisance and trespass—and statute, alleging a "timber trespass." I address the common-law theories first.

Conceptually, cases involving wrongful discharge of water onto a neighboring property can be looked at as a trespass—a wrongful invasion of real property—or a private nuisance—a wrongful deprivation of the quiet enjoyment of real property.[172] The Plaintiffs have proceeded under both theories, and it makes little difference which is operative here. Much of the Oakwood Village Site drains naturally onto the Robinson Property. Because Delaware law recognizes the general right for an upper landowner to drain water by means of its natural flow,[173] neither theory of recovery is tenable absent a showing of unreasonable use; that is, that the increase in discharge is unreasonable under the circumstances. Thus, I start with a reasonable use analysis. I find, following a balancing of the relevant factors, that the Oakwood Village Site's use is unreasonable and that liability attaches for a trespass.

### 1. The Reasonable Use Doctrine

The Oakwood Village Defendants argue that "because the Development's excess discharge is justified under the reasonable use standard the Court must find

---

[172] *See, e.g.*, *Beckrich Holdings, LLC v. Bishop*, 2005 WL 1413305, at *11 (Del. Ch. June 9, 2005) (finding "this flow of water constitutes a continuing nuisance and trespass.")

[173] *See generally Weldin Farms, Inc. v. Glassman*, 414 A.2d 500 (Del. 1980) (adopting the "reasonable user" standard).

33

that the additional water directed onto the Plaintiffs' Property falls well within the acceptable parameters of the reasonable use doctrine."[174] Delaware law recognizes that "[a]n upper landowner unquestionably has the right to drain water by means of its natural flow toward downstream properties."[175] However, "Delaware follows the 'reasonable user' rule to assess the actions of an upper landowner who artificially increases the flow of its storm water downstream."[176] An upper landowner will be liable for the development of her property where she "artificially alters the course of waters flowing downstream so as to increase their volume, acceleration, or concentrated output onto downstream properties in ways that cause material injury."[177] Whether the use is reasonable depends on a fact-specific balancing of "the utility derived by the upper landowner from his development against the amount and foreseeability of harm that he created by altering the flow of surface waters toward downstream property."[178] Further, in assessing the reasonableness of the use, "courts consider the social value of improving land through development."[179]

---

[174] OVAL Post-Trial Answering Br. 48. *See id.* at 42 (arguing that Plaintiffs' trespass and nuisance claims fail under the reasonable use analysis).

[175] *Quereguan v. New Castle Cty.*, 2010 WL 4241583, at *5 (Del. Ch. Oct. 22, 2010) (citing *Weldin Farms*, 414 A.2d at 502).

[176] *Trustees of Vill. of Arden v. Unity Const. Co.*, 2009 WL 1530711, at *2 (Del. Ch. May 27, 2009) (citations omitted).

[177] *Quereguan*, 2010 WL 4241583, at *5 (citation omitted).

[178] *Id.* (citation omitted).

[179] *Id.* (citation omitted). In the damages context, it is difficult to understand the utility of the "reasonable use" test, since assuming social utility outweighs damages, development would occur even if the upstream user were strictly liable, and the market, rather than the Court, would make the determination.

I find this Court's decision in *Trustees of Village of Arden v. Unity Construction Company* ("*Arden II*"),[180] and its application of the reasonable user standard, most instructive to the facts and legal issues before me in this matter. *Arden II* involved three general parcels of land. The highest in elevation was a pre-existing suburban development.[181] That parcel drained onto a newer development, "Buckingham Greene"—the homeowners' association of which was the defendant in the action.[182] The third and lowest point was "Sherwood Forest," a wooded and "beautiful natural setting."[183] Sherwood Forest was located on a slope and water would flow through it naturally from the Buckingham Greene site, historically, without major erosion.[184] The plaintiff, Village of Arden, served as trustee to Sherwood Forest, and brought the action following "significant erosion" in Sherwood Forest.[185]

Prior to the development of Buckingham Greene, water from the suburban development situated above it would flow onto Buckingham Greene and "over its then-undeveloped farmland or meadows."[186] Thus, the stormwater's descent "was

---

[180] 2009 WL 1530711 (Del. Ch. May 27, 2009).
[181] *Id.* at *1.
[182] *Id.*
[183] *Id.*
[184] *See id.*
[185] *Id.* While the names evoke the Olde England of Shakespeare and legend, the parcels are located in New Castle County, Delaware.
[186] *Id.*

slowed by the [Buckingham] site's vegetation until it reached Sherwood Forest."[187]

Developers of Buckingham Greene faced two stormwater challenges—the existing discharges which flowed across the land from the higher situated, already developed land, and the new discharges that would be generated from within the new Buckingham Greene development from, among other things, "roofs, driveways, and roads."[188] The stormwater management plan for Buckingham Greene was "designed competently and in accordance with prevailing engineering practices," and approved by the county and constructed in accordance with all plans and permits.[189] In sum, that system included a "splash pool" designed to reduce velocity of the flow and avoid erosion in the lower situated Sherwood Forest. However, Buckingham Greene's splash pool and stormwater plan did not function as expected. The effluent from Buckingham Greene caused extensive erosion within Sherwood Forest immediately adjacent to the discharge point, carving a ditch of approximately three to five feet deep, and five to ten feet wide, placing in jeopardy "[t]rees and other flora."[190] The "harm" occurred "primarily during significant weather events" and the question of why an otherwise "prudently engineered" system was causing damage was not entirely clear.[191] The Court posited several possibilities, including

---

[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.* at *1–2.

greater than anticipated volume and velocity of water flows, and the nature of the soils in Sherwood Forest.[192] The Court concluded that by focusing an increased volume to a single discharge point, "the development of Buckingham Greene was the proximate cause of the large scale erosion in Sherwood Forest."[193]

The Court in *Arden II* applied the reasonable user test. The Court found the harm to Sherwood Forest via the development's discharge "palpable and severe."[194] Further, even though Sherwood Forest was vacant, a focus on that fact was inappropriate because such "a view would unfairly demean the stewardship responsibilities regarding pristine natural areas—especially as surrounded by widespread development."[195] Rather, the Court credited "[t]he uniqueness, beauty, and natural heritage of the Sherwood Forest . . . ."[196]

Against the above, the Court balanced the following facts: Buckingham Greene did *not foresee* the harm, adhered to appropriate design plans, and its conduct in designing and building the stormwater system did "not even approach . . . negligence."[197] Further, the use of the Buckingham Greene site to provide housing for many families was "a matter of significant social utility."[198] Ultimately, the

---

[192] *Id.* at *2.
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] *Id.*

Court concluded that the "balance, however, tends to favor the [plaintiffs], although not by a wide margin, *because of the scope of the harm and because the harm is so directly traceable to actions of* [Buckingham Greene]. In short, it is unreasonable for Sherwood Forest to bear the burden imposed by [Buckingham Greene]."[199] In light of its finding—that the use was unreasonable, but that the balance was close—the court employed a further reasonableness discussion in determining the proper remedy.[200]

Here, it is obvious that the development of Oakwood Village has created social utility by providing homes and increasing the value of real property. It has also created downstream damage. The Robinson Property, similar to Sherwood Forest in *Arden II*, includes certain unique natural features that an upstream user may not freely diminish or impair simply because the land is undeveloped or because the damage is not to a particular business or enterprise. As with the erosion in *Arden II*, the present harm of increased depth and frequency of ponding is directly traceable to an adjacent development's discharges. While the damage is different from and not as dramatic as that in *Arden II*, neither are the equitable factors as favorable to the upstream property owner. Here, it was foreseeable that the point discharge across the property boundary near pond 4 would increase. Here, there was no natural

---

[199] *Id.* (emphasis added).
[200] *Id.* at *3.

watercourse available to convey the discharge, and Oakwood Village's developers were aware of the need to purchase a stormwater easement from the Robinsons. Here, the developers were aware of non-draining sumps on the Robinson Property, downhill from the discharge point. While the Defendants may not have foreseen the specific damage that has resulted, these or similar consequences of their actions should have been foreseeable. For these reasons, and the additional circumstances below, I find that the balance tips in favor of the Robinsons.

At the encouragement of the parties, I walked the relevant sites during this litigation, in the summer dry season. The harm from the increased discharge was readily apparent. Water was standing in the sumps, preventing the Robinsons' use and enjoyment of portions of their property. Mature trees standing in this water were leafless and, apparently, dead, in contrast to the trees on higher ground, which were leafed-out and apparently healthy. It does not take an expert to observe that mature trees do not grow to size in the same conditions that kill them.

Nonetheless, the record contains evidence corroborating my observations, both expert and lay, sufficient in its own right to support my finding that the Robinsons have suffered material damage from the run-off attributable to the development of Oakwood Village. Testimony concerning the overland flow of water onto the property, the correspondence of that flow with the development and operation of the Stormwater Management System in Oakwood Village, the resulting

39

increase in the depth and duration of standing water in the sumps, and expert testimony about the effect on trees in those sumps,[201] support a finding that development of Oakwood Village and the operation of its Stormwater Management System are the proximate cause of the ponding and the dead trees on the Robinson Property.[202]

I find by a preponderance of the evidence, including the correspondence of the healthy and dead trees to the extent of standing water, that damage to the trees was caused by the increased discharge. I also find that the Robinsons' ability to use and enjoy their property has been diminished by the increased discharge. I find that the Robinson Property is being damaged such that Oakwood Village's increase in discharge is not reasonable under the circumstances present here. That is, as in *Arden II,* it is inappropriate for the Robinson Property to bear the burden imposed by the development of the Oakwood Village Site.

There is no debate that an artificial increase in surface waters has occurred due to the development of what was once wooded land[203] into a suburban subdivision with corresponding impervious surfaces. While the Defendants have a right to develop the Oakwood Village Site, the documentary record adequately reflects that

---

[201] *See* Trial Tr. 294:1–24 (Carlson); *id.* at 306:23–307:15 (Carlson).
[202] I have omitted comprehensive citation to the record here, because comprehensive review of the evidence will occur in the damages opinion to follow.
[203] *See, e.g.*, JX359.

40

the changes resulting from that development have caused an increase of surface waters currently entering the Robinson Property, and that such increase is harming the Robinson Property in a material way.

I note that unlike certain other cases in this area of the law,[204] the discharged water here is not going into a defined preexisting stream or channel. Rather, it is discharging across the land, in sheets, with enough force to create erosion. That is, the discharge is, at times, causing minor channelization, but this is not a case where an upstream owner is simply increasing discharge of water into an existing stream or channel. As recited above, the developers were well aware of the lack of a channel to carry off effluent.[205] Following the development of Oakwood Village, water exits that site at the southwest-corner in sheets flowing across the land, in sufficient depths and at sufficient volumes to carry away the soil and cause erosion into the earth, and to deposit silt and debris on the Robinson Property. Thoreau famously wrote of "a trout in the milk" as strong circumstantial evidence:[206] here, photographic evidence shows a good-sized fish washed down-slope into the Robinsons' woods, similarly convincing circumstantial evidence of heavy flow from Oakwood Village into the

---

[204] *See, e.g.*, *Weldin Farms*, 414 A.2d at 501, 503 (invoking the reasonable use doctrine where the increase in flow was to "Turkey Run," a stream which runs through and alongside the plaintiff's property, which after additional upstream development would overflow its banks with more frequency).

[205] *See Chorman v. Queen Anne's R. Co.*, 54 A. 687 (Del. Super. Ct. 1901) (indicating liability where increased discharge onto plaintiff's field damaged standing crops).

[206] Henry David Thoreau, Journal, Nov. 11, 1850.

Robinson Property.[207]   The central portion of the Robinson Property contains a relatively low-lying depression that was historically seasonally wet and occasionally ponded.  The record indicates this feature is now ponding at higher levels and with materially greater frequency.  The fact that the sumps were historically wet does not mean that the changes attributable to the development of Oakwood Village are reasonable or less than material.[208]  In other words, the existence of wet-but-useable features on the Robinson Property is no license to adjoining property owners to utilize that feature as a part of their stormwater system, without an easement.  I note the record reflects an awareness by certain Defendants of the need to acquire a stormwater disposal easement: such private ordering should have been the mechanism for avoiding this dispute.[209]

The Defendants also have certain factors balancing in their favor, as mandated in the reasonable-use analysis.  As stated above, there is social value to development of real property.  The stormwater system here, while the subject of several non-

---

[207] This fish was surely no trout—it seems to have been a small bass. *See* JX251 at Oct. 22, 2014 photographs. *See also* Draft Nov. 29, 2016 Oral Argument Tr. at 60–62 (arguing bass may have been dropped in the woods by a wayward and poorly-coordinated eagle).

[208] *See McCarthy v. Abe*, 1993 WL 93373, at *1 (Del. Ch. Mar. 3, 1993) (finding that certain defendants were *not reasonable users*—even though not all the water that accumulated on the plaintiff's land was a result of the new users pumping water into a ditch—where those new users caused a "substantial increase" over what otherwise might be present). *See also id.* (noting that "[t]he Court has little doubt that the land in question is not very suitable for residential use but as long as the County and State permit developers to sell water logged timberland as home sites, drainage problems such as these will arise").

[209] I note, in this sense, the Defendants have preferred to roll the dice; they have directed discharge on a neighbor, and then argued that the resulting damages are within the reasonable use doctrine or do not support injunctive relief.

42

compliance citations and a five-figure DNREC fine, has otherwise been constructed pursuant to valid permits and County approval. I note, however, in light of the record developed at trial, and outlined in this Opinion, I have serious doubts that the approval of the plans for this community and its stormwater system were as pristine as the process in *Arden II*. That is, in *Arden II*, there was a model planning, permitting, and construction process. Nonetheless, when the system operated in an unexpected way, the fact that stormwater system was properly permitted and approved was not enough to relieve the defendant of liability for the harm caused by the discharges. Certainly, the permitting and construction process here—with its questionable revision and deficiencies—is not more helpful in equity to the Defendants than the process in *Arden II*. In light of the foregoing, I find that the balance of the reasonable use analysis favors the Robinsons.

### 2. Trespass and Nuisance

The tort of "[t]respass is a strict liability offense, the elements of which are entry onto real property without the permission of the owner."[210] Further, as this Court has explained, "[a]ny entry on land in the peaceable possession of another is deemed a trespass whether the defendant acted intentionally or not."[211] Prior cases in this Court involving the flow of water have found that "the instrumentality which

---

[210] *Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at \*5 (Del. Ch. July 20, 2007) (quoting *Beckrich Holdings*, 2005 WL 1413305, at \*9).
[211] *See Alfieri v. State*, 1984 WL 478437, at \*3 (Del. Ch. Aug. 8, 1984) (citation omitted).

43

constitutes the means for the trespass may take any intrusive form, *including water from an improperly constructed [artificial structure].*"[212]  That is, a "trespass then may be said to consist of the intrusion of water from a condition created by the [defendant] which interferes with plaintiffs' use of their property."[213]  As noted above, reasonable use is a defense to the discharge of water in a trespass action,[214] but I have found the discharge here to be unreasonable.

Through the factual record developed at trial, and my experience walking the site, it is clear that water via artificial conditions on the Oakwood Village Site is discharging at an increased rate onto the real property of the Robinsons.  In fact, that is how the stormwater system is designed to operate, as the *only* positive outfall is directly pointed at the Robinsons Property.  I find, therefore, the Plaintiffs have shown a trespass by the preponderance of the evidence.[215]

The Plaintiffs have also pursued a claim for nuisance.  "A private nuisance generally is defined to be anything that results in harm, inconvenience or damage,

---

[212] *Id.* at *3 (emphasis added).  While I do not make a finding here that the stormwater retention ponds were in fact improperly constructed, I do conclude the water that they are discharging can be the basis for a trespass action.

[213] *Id.  See Beckrich Holdings*, 2005 WL 1413305, at *9 (quoting *Alfieri*, 1984 WL 478437, at *3).

[214] I note that the Defendants have also raised what amounts to a "ditch defense."  Specifically, that if the purported "ditches" on the Robinson Property were, per the Defendants, better maintained, they would not currently be facing substantial water ponding problems.  Without commenting on the viability of such a defense, I note that there has been an insufficient showing made factually to consider it here.  The Defendants have failed to show that historical ditches drained the Robinson Property in a way that could accommodate the runoff from Oakwood Village.

[215] The acquiescence defense is discussed in more detail *infra*.

or which materially interferes with the enjoyment of rights or property of a particular entity."[216] Here there has been harm that materially interferes with the Robinsons' right to enjoy their property. I find that the conditions described above support a finding of nuisance. Such a finding is consistent with prior decisions in this Court that recognize that an ongoing flow of water can constitute both a trespass and a nuisance.[217] I need not dwell on this theory, since under the circumstances, the damages and equitable relief available are the same under either theory.

I have found the discharge of water onto the Robinson Property to be tortious. The remaining question is which Defendants (or Defendant) are liable in tort. The Plaintiffs have attempted to implicate any Defendant that played any role in developing the stormwater system in question.[218] I find Plaintiffs' theory difficult to comprehend. They have provided me with no applicable precedent for such a widespread finding of liability for trespass.[219] The owner of the property at all times

---

[216] *Beckrich Holdings*, 2005 WL 1413305, at *9 (citation omitted).

[217] *See id.* at *11 (finding "this flow of water constitutes a continuing nuisance and trespass"). *See also* Restatement (Second) of Torts § 821D cmt e (1979) (noting "the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of long duration").

[218] *See, e.g.*, Pls' Post-Trial Opening Br. 47 (arguing "[a]ll of the Defendants played a role and are responsible for setting in motion the stormwater discharge that resulted in the trespass); Draft Nov. 29, 2016 Oral Argument Tr. at 12 (arguing "[i]f you participate in the tort, anyone who participates in that tort is liable").

[219] *But see Trustees of Vill. of Arden v. Unity Const. Co.*, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000) (stating "[t]his Court has broadly held that '*[a]ll those who participate* in the creation or maintenance of a nuisance are generally liable to third persons for injuries suffered therefrom.'") (quoting *Keeley v. Manor Park Apts., Sec. I*, 99 A.2d 248 (Del. Ch. 1953)) (emphasis supplied by Court of Chancery in *Arden*). While this language has been repeated by our Court on several occasions, the citations trace their root back to the *Keely* case cited above. In *Keely* the Court of Chancery was faced with a summary judgment motion where the moving defendant had *previously*

45

during which a trespass or nuisance has occurred is the current owner of the development and stormwater ponds,[220] Oakwood Village LLC. Oakwood Village LLC's stormwater system is causing the ongoing trespass and nuisance to the Plaintiffs' property. Oakwood Village LLC is the entity liable to the Robinsons in tort. The Plaintiffs seek various damages purportedly arising for these torts—including the temporal loss and enjoyment of certain portions of their property, compensation for the killed trees, compensation for the spoilage of their drinking water allegedly caused by the discharge, and compensation for "mental anguish."[221]

---

*owned* and designed a development, and dedicated the streets for use by the general public. *Keeley*, 99 A.2d at 248–49. The plaintiffs sued the moving defendants seeking injunctive relief for water draining onto their property. *Id.* The defendants sought dismissal on the ground that they no longer owned the property from which the nuisance emanated; evidence in the record, however, indicated that the moving defendants had demanded the construction of the water drainage conduit which was causing the harm, that they owned portions of the conduit, and that water from other lands they owned was draining into the conduit and flowing onto the plaintiff's land. *Id.* at 249–50. The defendants, according to the plaintiffs, also retained the fee to the streets, and had caused the contractor to construct the conduit "according to their specifications." *Id.* at 250. The Court observed that "[o]ne who erects a nuisance will sometimes be liable for its continuance after he has parted with the possession of the land, *particularly where he conveys the property with covenants for the continuance of the nuisance or otherwise derives benefit therefrom*." *Id.* (citations omitted) (emphasis added). The *Keely* court denied the defendants' summary judgment motion for, among other reasons, the presence of a genuine dispute of material fact regarding whether the defendants "contributed to or participated in *to a substantial degree* the laying out of the streets or the laying out of the conduit, or both, to the damage of plaintiffs." *Id.* (emphasis added). I note the circumstances of *Keely*, are distinguishable from the position of the Defendants here. The Defendant that is equivalent to the defendant in *Keely* who lost the motion for summary judgment is Oakwood Village LLC, the owner of the fee at all relevant times. Later decisions of this Court have recognized that "[t]he non-property owner's participation [in the nuisance] *must be substantial*, however, for his conduct to constitute the legal cause of the harm." *See Hazlett v. Fletcher*, 1985 WL 149636, at *2 (Del. Ch. Mar. 1, 1985) (emphasis added). Here, I find insufficient evidence on which to extend liability beyond the fee owner during the periods relevant to trespass and nuisance liability—Oakwood Village LLC.

[220] As represented by the parties.

[221] *See* Pls' Post-Trial Opening Br. 60–63.

46

I find that the Plaintiffs have failed to show by a preponderance of the evidence that they are entitled to recovery for damages to their well-water or for mental anguish. The quantum of damages for damage to timber and loss of use await further proceedings, as discussed below.[222]

The Robinsons variously allege that other Defendants participated in creation of an improper stormwater system design, under contract to the developers of Oakwood Village. This may give rise to contract liability *to* Oakwood Village LLC, but the Plaintiffs have failed to show that the other Defendants are liable under theories of nuisance or trespass.

### 3. Timber Trespass

The Plaintiffs seek a determination that the death of standing timber on their property caused by increased discharge from the Oakwood Village Site entitles them to triple damages and attorney's fees under 25 *Del. C.* § 1401 (the "Timber Trespass Statute" or "Section 1401"). At common law, damage was compensable for torts, including conversion or trespass, in the amount of the actual damages; that is, the tortfeasor's victim could be made whole for his loss. As for attorney's fees, Delaware follows the American Rule, under which each party bears her own fees.

---

[222] *See infra* Section IV.

In derogation of the common law, the General Assembly has provided treble damages and fees for the willful conversion of timber.[223]  In case of an unintentional trespass, the Timber Trespass Statute provides fees but otherwise preserves the common law; damage or conversion of timber is compensable, but treble damages are not available.[224]  "Willful" conversion of timber is treated differently.  The Timber Trespass Statute provides:

> (a) Whoever wilfully, negligently or maliciously *cuts down or fells* or causes to be cut down or felled a tree or trees growing upon the land of another, without the consent of the owner, *shall be liable* for damages as set forth in subsection (b) of this section.

> (b) In civil actions brought for an act of timber trespass the court shall have the authority to determine whether such trespass was unintentional or wilful and award damages accordingly. If the plaintiff shall satisfy the court that the metes and bounds of that plaintiff's property at the place of the trespass were appropriately established and marked by reasonably permanent and visible markers, or establish that the trespasser was on notice that the rights of the plaintiff were in jeopardy, the court shall find that the trespass was wilful and shall award exemplary damages equal *to triple the fair value of the trees removed* plus the cost of litigation. If, however, the court shall find that the trespass was unintentional, the court may award the plaintiff damages equal to the conversion value of the trees taken or damaged plus cost of litigation.[225]

In other words, knowingly entering the lands of another, and removing the timber, results in the shifting of fees and an award of "triple the fair value *of the trees*

---

[223] *See* 25 *Del. C.* § 1401.
[224] *See id.*
[225] *Id.* (emphasis added).

48

*removed.*"[226]   The reason for this statute, which exists in other forms in other jurisdictions,[227] is not difficult to discern.   Standing timber is a valuable asset.   Unlike most other such assets, it is difficult to safeguard.  It cannot be kept under lock and key.  It takes many years to create, yet is readily removed.  Most saliently, it exists often in remote areas that even a careful owner cannot be expected to continuously monitor.  Thus, the Legislature increased the disincentive to willful conversion by applying treble damages for the taking of timber by trespass.

The Plaintiffs urge me to find a willful timber trespass on the facts of this case. They ask me to apply treble damages for the value of trees killed or damaged by the increased discharge onto the Robinson Property.  This is a novel interpretation of the statute.  No trees have been removed from the property by the Defendants; in fact, the Robinsons also seek damages for the cost of felling and removing dead and dying trees occasioned by the increase in effluence.  The Plaintiffs argue that the entry here was intentional, or at least foreseeable, but there certainly was no will on the Defendants' part to kill, let alone "remove," the Robinsons' trees. The matter before me is not the scenario to which the statute is addressed.  More important to my decision, however, is that the statute is in derogation of the common law, and must

---

[226] *Id.* (emphasis added).
[227] *See, e.g.*, *Jongeward v. BNSF R. Co.*, 278 P.3d 157, 160 (Wash. 2012) (observing that one purpose of the Washington State statute protecting timber is to "discourage persons from carelessly or intentionally removing another's merchantable shrubs or trees on the gamble that the enterprise will be profitable if actual damages only are incurred") (citation omitted).

be read strictly.[228]  The plain language of the statute prevents a finding that a timber trespass has taken place here.

First, the statute provides for a remedy against those who, while trespassing, "cut down or fell" trees.[229]  Here, no one has cut a single Robinson tree, although I have found by a preponderance of the evidence that the actions of certain Defendants have caused ponding which has damaged or killed trees on the Robinson Property. The Plaintiffs argue that the trees have been "felled."  They argue that the statute should be construed to avoid redundancy; that "fell" must thus mean something other than "cut down," and therefore that "fell" here means damage or kill.[230]  But this is a *non sequitur*.  There are other ways to remove trees than "cutting," and fell need not mean "damage" to avoid redundancy.  The treble damage provision of Section 1401 is directed to "removal," and standing timber cannot be removed unless it is cut down or felled.[231]

The verb "fell" is defined in Webster's Third New International Dictionary as "to cut, beat, or knock *down* or bring *down*, . . . [as fell] a tree. . . . "[232]  The Plaintiffs point out that fell can have a second meaning, kill, as in "a final attack of pneumonia [felled] him."[233]  But this usage is limited to animals or humans who are thus taken

---

[228] *See Higgins v. Walls*, 901 A.2d 122, 131 (Del. Super. Ct. 2005).
[229] 25 *Del. C.* § 1401.
[230] *See* Pls' Post-Trial Opening Br. 48–49.
[231] *See* 25 *Del. C.* § 1401(b).
[232] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 836 (3rd ed. 2002) (emphasis added).
[233] *Id.*

down—a speaker of standard English would not refer to girdling a tree, or otherwise damaging or killing it, as having felled the tree while it still stood. In any event, the statute is in derogation of the common law, and must be read strictly "against the party seeking its protection."[234] The statute applies only to timber cut down or felled. Further, in order to evoke the treble damages provision of Section 1401(b), the timber must be cut down or felled, *and* "removed" from the property.[235] Since none of those things has happened, the statute is inapplicable, and the Plaintiffs are limited to their common-law remedy.[236]

I note our Supreme Court has, on at least one occasion, addressed Delaware's Timber Trespass Statute.[237] The Plaintiffs cite to that decision, *J.S.F. Properties, LLC v. McCann*,[238] as supportive of their position.[239] The Court in *J.S.F.*, however, did not engage in a statutory construction helpful to the issues before me here, regarding whether these Defendants "felled" trees—rather it affirmed the lower court based on the lower court's finding of an intentional trespass.[240] The defendant there admitted to destroying timber and vegetation on the plaintiff's property, and

---

[234] *Higgins*, 901 A.2d at 131 (citing *State v. Brown*, 195 A.2d 379, 383 (Del. 1963) ("It is true that statutes in derogation of common law must be strictly construed.")).
[235] *See* 25 *Del. C.* § 1401(b).
[236] I note that a decision that construed "fell" so broadly as to impose liability in derogation of the common law in these circumstances would be a fell ruling, indeed.
[237] *J.S.F. Properties, LLC v. McCann*, 2009 WL 4301625 (Del. Dec. 1, 2009).
[238] *Id.*
[239] *See* Pls' Post-Trial Opening Br. 49–50.
[240] *J.S.F. Properties, LLC*, 2009 WL 4301625 at *2.

admitted to observing stakes and boundaries placed by the plaintiff's surveyors before they entered the land.[241] Further, the defendant's principal was orally advised regarding the boundary by the plaintiff, and the defendant actually performed landscaping and construction damaging the plaintiff's property.[242] On appeal the defendant argued that the Superior Court improperly found a timber trespass.[243] The Supreme Court, without analyzing the specifics of the statute, found that the record supported a "factual finding" of timber trespass "by an intentional trespass."[244] The *J.S.F.* analysis sheds little light on the issues present in this litigation.

Because the plain meaning of the statute does not evoke its application under the circumstances present here, I cannot find an intentional timber trespass, and the corresponding treble damages and fee shifting are unavailable.

### 4. Negligence

The Plaintiffs also assert a negligence action, advancing two theories for negligence recovery—common law negligence and negligence *per se*.[245] The Plaintiffs pursued these theories while conceding that "the negligence is largely subsumed with everything else."[246] A prima facie claim for the tort of negligence

---

[241] *Id.* at *1–2.
[242] *Id.*
[243] *See id.* at *1.
[244] *Id.* at *2.
[245] *See New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001) (observing that "[t]he phrase 'common law' negligence is sometimes used . . . to differentiate between ordinary negligence and negligence *per se*").
[246] Draft Nov. 29, 2016 Oral Argument Tr. at 17.

requires a showing of "duty, breach, causation, and harm."[247] Therefore, "[t]o prevail in a claim for negligence, a plaintiff must establish that: 1) the defendant owed the plaintiff a duty of care; 2) the defendant breached that duty; 3) the plaintiff was injured; and 4) the defendant's breach was the proximate cause of the plaintiff's injury."[248] The Plaintiffs argue that the Defendants owed them the duty to behave as ordinary, prudent people, that they breached that duty by failing to protect from unreasonable risks of harm to others via stormwater discharges, and that such alleged breach was the proximate cause of the Robinsons' injuries.[249]

The Plaintiffs must prove each element of a negligence claim by a preponderance of the evidence. Here, as the Defendants have observed, there has been a failure of proof regarding the applicable standard of care against which a breach must be measured.[250] While the ordinary standard of care is that of a prudent person, Delaware law recognizes that "[a]s a general rule the standard of care applicable to a professional can only be established through expert testimony."[251] Conceptually, this must be the rule—an injured brain surgery patient cannot come before the trier of fact and simply allege some harm occurred, therefore the doctor must have been negligent; conversely, a prudent man would not attempt brain

---

[247] *Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010).
[248] *Campbell v. DiSabatino*, 947 A.2d 1116, 1117 (Del. 2008).
[249] *See* Pls' Post-Trial Opening Br. 60.
[250] *See* OVAL Post-Trial Answering Br. 37.
[251] *See Weaver v. Lukoff*, 1986 WL 17121, at *1 (Del. July 1, 1986).

surgery absent special training. In such a case, in addition to proving the other elements of the tort of negligence, the successful plaintiff must establish the professional standard of care, and that it was violated. Thus, when the situation from which the harm arises includes a professional performing her job in an area outside of a lay persons' ordinary understanding, including—pursuant to our case law—harm arising from construction projects, an expert is needed to establish the appropriate standard of care.[252] Here, the Defendants argued in the various answering briefs that Plaintiffs' claims fail for lack of expert testimony on the issue of the necessary standard of care in design and construction of a stormwater system.[253] The Plaintiffs have failed to respond. I note that the Plaintiffs fail to identify any testimony establishing the relevant standard of care, nor do they effectively dispute that the object of the alleged negligence here—a multi-pond professionally-designed and -engineered stormwater system—is of a nature that requires establishment of the standard of care by expert testimony. Here, because there has been *no evidence* regarding the standard of care for a large-scale stormwater project, I find that the Plaintiffs have failed to make out the required

---

[252] *See Roberts v. Daystar Sills, Inc.*, 2008 WL 8203205, at *3 (Del. Super. Ct. Dec. 8, 2008) (finding in a personal injury action which occurred on a construction site that "[w]ithout an expert to explain the routine practices and acceptable conditions at a closed construction site, where trade persons are trained to work in and around precarious conditions, the jury would be left to speculate as to the standard of care"). *See also Robinson v. J.C. Penney Co.*, 2009 WL 2158106 (Del. July 21, 2009).

[253] *See, e.g.*, OVAL Post-Trial Answering Br. 37.

elements of a common law negligence action based on the design or construction of that system.

Alternatively, the Plaintiffs attempt to rely on the concept of negligence *per se*. Negligence *per se* essentially merges the duty and breach analyses of a common law negligence claim. As our Supreme Court has recently stated, "[n]egligence *per se* requires the defendant to have committed an unexcused *violation* of a statute or regulation that the trial judge adopts as the *standard of care*."[254] Thus, the statute provides the duty and the violation is the breach of that duty; the plaintiff still must prove causation and injury. Negligence *per se*, however, is only applicable in certain circumstances. Specifically, negligence *per se* requires showing the "violation of a Delaware statute enacted for the safety of others."[255]

The Plaintiffs point to various administrative "out of compliance" findings and a later administrative penalty for violations of stormwater regulations, imposed on Oakwood Village LLC, issued by DNREC. The Plaintiffs argue that

> [t]he Stormwater Regulations are designed, *inter alia*, to protect members of the community from the adverse effects of stormwater. Plaintiffs are residents of the State of Delaware. Accordingly, Plaintiffs are members of the Stormwater Regulations' protected class. Moreover, Plaintiffs' damages are directly related to the discharge of stormwater from [the Oakwood Village Site]. Accordingly, the harm

---

[254] *Hudson*, 3 A.3d at 250 (citation omitted) (emphasis added).
[255] *See Lechliter v. Del. Dept. of Nat'l Res. & Envir. Ctl.*, 2015 WL 9591587, at *17 (Del. Ch. Dec. 31, 2015) (citation omitted).

suffered by Plaintiffs is the type of harm that the Stormwater Regulations were designed [to] protect.[256]

Considering this, the Plaintiffs conclude that "[u]nder the standard of care promulgated by the Stormwater Regulations, the Defendants are liable for negligence *per se* for the violations that DNREC identified."[257]

The Defendants, for their part, argue that the stormwater regulations are not health and safety statutes that can trigger a finding of negligence *per se*.[258] They point out the technical nature of such regulations and suggest they are not suited to a negligence *per se*-type analysis. The issue appears to be of first impression. The Plaintiffs cite to a Georgia case but not Delaware case law.[259] I need not decide the issue here, however.

The Plaintiffs allege, and I have found by a preponderance of the evidence, that the stormwater system as approved and constructed is causing a continuous trespass and nuisance, resulting in damages. They have not attempted to demonstrate or quantify causation or damages *specific to the violations of stormwater regulations* upon which they seek to rely in their negligence allegations.

---

[256] Pls' Post-Trial Opening Br. 59 (internal citations omitted).

[257] *Id.* at 60.

[258] *See* OVAL Defs' Answering Br. 37 (citing *Lechliter*, 2015 WL 9591587, at \*17). The Lessard Defendants also argue that there has been no showing of sufficient involvement by any of them to establish they violated any statute—the citations were issued after they no longer held ownership in Oakwood Village LLC, and were issued for site work performed by George & Lynch. *See* Lessard Defs' Post-Trial Answering Br. 53.

[259] Pls' Post-Trial Reply Br. 31 (citing *Pulte Home Corp. v. Simerly*, 746 S.E. 2d 173 (Ga. App. 2013)).

I have no basis to assess damages for any of these violations—for example, failure to repair a silt fence—apart from the overall damages suffered, nor is there any indication that such damages, if proven, would not be subsumed within the damage framework of the trespass and nuisance torts which I *have* found. Since proof of causation and damages are required elements of negligence,[260] the Plaintiffs have failed to show entitlement to relief on the basis of any Defendants' negligence *per se*.

### 5. Fraud

The fraud claim here arises from the pre-development negotiations between the Plaintiffs and representatives of Lessard Builders, and from certain stormwater-related submissions by certain Defendants to the Sussex Conservation District. Additionally, the Plaintiffs point to the March 9, 2006 letter written by Bender, the Stormwater Engineer for the Sussex Conservation District, asking Lessard to explain the anticipated stormwater discharge to the Robinsons. The Plaintiffs assert that some Defendant forged the signature of Mr. Robinson on the letter before returning it to the Sussex Conservation District as part of the stormwater approval process.

Under Delaware law, the elements of a fraud claim are well established. The Plaintiff must show:

1) a false representation, usually one of fact, made by the defendant;

---

[260] *See Lechliter*, 2015 WL 9591587, at *17 (noting that in a claim for negligence *per se* "the plaintiff must demonstrate that the defendant's violation proximately caused his injury").

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
3) an intent to induce the plaintiff to act or to refrain from acting;
4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
5) damage to the plaintiff as a result of such reliance.[261]

The Plaintiffs have produced some evidence supporting an inference that the March 9 Letter was not signed by Mr. Robinson. They have fallen well short of proving by a preponderance of the evidence that it was a forgery, however. Mr. Robinson's signature on the letter, I note, did not indicate authorship. It was meant, presumably, to indicate that he had read the letter, which involved stormwater discharge onto his property. I find most likely that, at a time when he was cooperating in the development of Oakwood Village in anticipation of a sale of his own property, Robinson was asked to sign, did, and fails to remember.

Similarly, the Plaintiffs have created some conflict in the record as to the accuracy of certain regulatory submissions, primarily including representations about the water flow from subarea 1S, in the stormwater addendum upon which the County based its regulatory approvals. The Plaintiffs note that, initially, drainage studies showed a portion of the Oakwood Village Site drained to the north, and argue that this information was omitted or inaccurately represented in some submissions to the County in the approval process.[262] I find, however, that the Plaintiffs have

---

[261] *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) (citation omitted).
[262] *See* Pls' Post-Trial Opening Br. 55–58.

58

failed to make an adequate showing of each element of the tort of fraud.[263] That is, the evidence is insufficient to demonstrate to me that a representation by any Defendant was knowingly false, or that the Plaintiffs (as opposed to third parties) were intended to or did act in reliance thereon. The Plaintiffs have failed to meet their burden of proof with respect to fraud.

*B. The Affirmative Defenses*

The Defendants assert two affirmative defenses. The defenses are that Plaintiffs' claims are time barred, and that the doctrine of acquiescence similarly bars Plaintiffs' claims. I find for the reasons reviewed below that neither is persuasive.

1. Acquiescence

The Oakwood Village Defendants assert that the "Plaintiffs acquiesced to the increased discharge" from the Stormwater Management System, thus they "cannot be heard now to complain about that which they agreed to accept."[264] The Defendants rely on Mr. Robinson's disputed signature on the March 9 letter from Mr. Bender of the Sussex Conservation District, which indicated an increase in runoff would occur at the Robinson Property boundary as a result of the Oakwood development, contrary to what the Defendants had identified was their—and the

---

[263] I note that the alleged fraudulent actions all occurred in the 2006-time period, and timeliness issues may also be problematic for recovery.
[264] OVAL Defs' Answering Br. 28.

Robinsons'—prior understanding. However, the same document disclosed that, if the point of analysis was moved five hundred feet *onto* the Robinson Property and the discharges from pond 4 were summed with reductions from other flows, there would be an overall slight decrease.[265] Bender asked that this matter be explained to the Robinsons. The Defendants point out that Mr. Robinson signed the letter, which to them indicates that he understood it and acquiesced to any resulting discharge onto his property. I have found by a preponderance of the evidence that Mr. Robinson's signature is genuine, despite his inability to remember signing.

At a general level, the operation of the doctrine of acquiescence "effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."[266] The doctrine "focuses on *the defendant's* knowledge of and reliance on the plaintiff's behavior (or lack thereof), and why the plaintiff must be adjudged complicit in the very breach for which she seeks damages."[267] Our Supreme Court has explained that a Plaintiff

> is deemed to have acquiesced in a complained-of act where he: *has full knowledge of his rights and the material facts and* (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition

---

[265] *See* JX168 at 3.

[266] *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014) (citation omitted).

[267] *Id.* (emphasis in original).

of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[268]

Further, "[f]or the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice."[269]

Mr. Robinson's signature falls far short of working an acquiescence or estoppel here. There has been no showing that Mr. Robinson, despite his signature, understood the letter, and certainly, no evidence has been submitted that any Defendant explained it to him. Moreover, the letter itself does not describe the conditions that the Robinsons have suffered. It describes an increase in discharge at the property boundary, but explains that in sum the total discharge was expected to slightly *decrease*. Assuming, therefore, Mr. Robinson fully understood the letter and its implications, and signed to indicate such, he cannot be said on that basis to have acquiesced to what has actually occurred, nor could any Defendant misapprehend that he had so consented. Finally, I assume that this property is held by the entireties, and there is no indication that *Mrs.* Robinson consented to or acquiesced in an ongoing trespass to the property. I do not find the Robinsons complicit in the wrong for which they are presently seeking relief, and the affirmative defenses of acquiescence or estoppel are inapplicable.

---

[268] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (citations omitted) (emphasis added).

[269] *Id.* (citations and footnotes omitted).

2. <u>Timeliness of this Litigation</u>

The Defendants assert that this litigation is untimely and should be dismissed under the doctrine of laches or the statute of limitations. This defense can be quickly dispensed with. Laches is an equitable doctrine that applies to litigants who slumber on their rights.[270] This Court typically applies the legal statute of limitations, by analogy via the doctrine of laches, to equitable claims, and directly with respect to requests for legal relief.

Here, I have found liability only for trespass and nuisance, conditions that continued, periodically, through the time of trial. Further, the factual record demonstrates that this trespass did not arise upon the initial development in 2006, but rather more recently.[271] In fact, the stormwater pond closest to the Robinson Property that is the discharge point for the system was empty as of 2012.[272] The tortious discharge began, obviously, sometime later. The Defendants allege that the analogous statute of limitations applicable here is three years.[273] This litigation began in 2014. There is no basis to apply laches or a limitation defense here.

---

[270] *See TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015) ("Laches will prevent someone who slumbers on her rights and delays unreasonably in filing suit from being permitted to prosecute her claims.").

[271] *See, e.g.*, Trial Tr. 1029:14–1030:21 (M. Robinson).

[272] *See* JX353.

[273] OVAL Defs' Post-Trial Answering Br. 29.

*C. Gary Cupples' Request for Fees*

Mr. Cupples, who represented himself in the majority of the filings in this action, has requested "attorney's fees" and other litigation-related costs arising from his involvement in this matter. To the extent Cupples incurred attorney's fees, he must bear them himself, absent some exception to the American Rule that obtains in this jurisdiction. I find no such exception, and his request is denied.

## IV. RELIEF

I find the Plaintiffs have shown they are entitled to damages for the trespass of water,[274] by a preponderance of the evidence. They have suffered damages to trees and lost the of use of a portion of their property. The appropriate injunctive relief awaits further litigation. Should the parties agree to settle the request for equitable relief, they should so inform me. Once equitable relief is in place, I can determine damages from the parties' citation to the record as it now exists.

## V. CONCLUSION

For the foregoing reasons Oakwood Village LLC is responsible for a trespass and nuisance on the Robinson Property. The parties should confer about how to efficiently present the issue of the appropriate equitable relief.

---

[274] And the corresponding nuisance.